617 So.2d 1198 (1993)
Ginger TAYLOR, Individually and for the minors, Eric Taylor, Timothy Taylor, Heather McCuin and Amanda McCuin, Plaintiffs-Appellees,
v.
STATE of Louisiana and TFC Timothy Ledet, Defendants-Appellants.
No. 92-230.
Court of Appeal of Louisiana, Third Circuit.
March 31, 1993.
Writ Denied July 1, 1993.
*1200 Christopher J. Roy, Alexandria, for Ginger Taylor, etc.
Bradley John Gadel, Alexandria, for state of Louisiana, etc.
Gregory Scott Erwin, Alexandria, for Greg Erwin, etc.
Before DOMENGEAUX, C.J., and KNOLL and SAUNDERS, JJ.
SAUNDERS, Judge.
This is an action ex delicto for damages resulting from the investigation and arrest of the plaintiff, Ginger Taylor, from a judgment in favor of plaintiff, and against defendants, State of Louisiana and Trooper First Class Timothy Ledet. Defendants appeal. We affirm as amended.

FACTS
On January 16, 1988, plaintiff requested that a prescription be filled at the Wal-Mart Pharmacy in Pineville, Louisiana. The prescription was for Darvon-65 (Dextro Propoxyphene, a Class IV narcotic), and the Wal-Mart pharmacist attempted to verify the prescription by telephone with the physician who ordered it. Because he was unable to obtain verification and was suspicious of the plaintiff, the pharmacist telephoned Trooper First Class Timothy Ledet (hereinafter "Ledet"), a narcotics investigator for the Louisiana State Police. Upon arriving at the Wal-Mart Pharmacy, Ledet handcuffed the plaintiff and took her to the Rapides Parish jail for booking. During the arrest, Taylor made the statement, "Oh, if you'd please let me go this time, I'll never do it again." After arriving at the parish jail, Ledet finally contacted the physician and the prescription was validated. These charges were subsequently dismissed. A separate suit has been filed based upon the Wal-Mart incident. The case sub judice involves the actions of Officer Ledet subsequent thereto.
On January 18, 1988, Ledet and Jim Hill, the Wal-Mart pharmacist, used the Wal-Mart computer to run a pharmaceutical profile of Ginger Taylor. Subsequently, on January 25, 1988, while conducting a separate drug investigation involving Stroud's Tioga Pharmacy, Ledet obtained a prescription history on the plaintiff from this pharmacy's computer. This report indicated that the plaintiff had a prescription for Class IV narcotics. On this occasion, Ledet also ran a computer check on "Christopher J. Roy", plaintiff's attorney. When asked why he ran a computer check on Mr. Roy, Ledet could give no explanation. He stated only that "it was just a name."
With this information, Ledet contacted his superior officer who directed him to conduct a survey of the pharmaceutical records of the pharmacies in the area. In the course of Ledet's prescription survey, *1201 he gathered information from the pharamacist with K & B Drugs in Pineville, Louisiana. The computer records of that pharmacy indicated several prescriptions for certain CDS Class IV narcotics, allegedly telephoned in from Dr. G. Mayeaux for the plaintiff. Ledet contacted Dr. Mayeaux who gave a written statement to Ledet indicating that he had no record or recollection of having treated the plaintiff or dispensing drugs to her or on her behalf. This information was verified by the DEA as fraudulent prescriptions.[1] However, the plaintiff was not arrested based upon this information because the pharmacist at K & B was shown a photographic line-up and could not specifically identify the plaintiff as the one who actually obtained the prescriptions.
Thereafter, Ledet contacted Merrick Marcantel of Marcantel's Pollock Pharmacy and conducted the same survey in a similar fashion. The pharmacist at Marcantel's voluntarily gave Ledet information that the plaintiff had obtained, by prescription refills from Stroud's Pharmacy, certain CDS Class IV narcotics. Again, Ledet contacted the physicians listed on the prescriptions to verify that the prescriptions were actually authorized. The physicians voluntarily consented to disclose information with regard to the validity of the prescriptions. Statements of the physicians revealed no record of prescribing the drugs in question. Specifically, a statement dated January 27, 1988, from Dr. Grover Baum indicated that he had no record or recollection of calling in Class IV narcotic prescriptions for the plaintiff. The Marcantel pharmacist positively identified the plaintiff as the one who had received the drugs allegedly prescribed by Dr. Baum.
The Marcantel pharmacist also testified that the plaintiff had picked up prescriptions under the name of Clarice Gates. Although Clarice Gates is plaintiff's mother, Ledet suspected that the plaintiff may have also been obtaining prescriptions under that name. A trace of those prescriptions led Ledet to Dr. Robert Rush and Dr. William DeFee. Both physicians submitted statements to Ledet that there existed no records of those prescriptions.
On February 18, 1988, Ledet obtained a subpoena duces tecum for the hard copies of the prescriptions at Marcantel's Pharmacy. Ledet testified that he prepared the subpoena himself and when asked who authorized it, he testified that:
"I just came up here to the D.A.'s Office and told one of the secretaries what I needed, they handed me a piece of paper and I went to the Clerk's Office and told them ... handed it to them and that's what they gave me."
Joe Beck, the District Attorney for Grant Parish, testified that he did not recall preparing, signing or authorizing any kind of subpoena in the Ginger Taylor case and also that his secretaries were not authorized to issue subpoenas out of his office.
After gathering information from the pharmaceutical survey, Ledet telephoned the District Attorney to discuss the case. The District Attorney testified at trial that Ledet sought a commitment as to whether or not he would prosecute the case, before Ledet would arrest the plaintiff. According to the District Attorney's testimony, a conversation of this nature was "just not standard procedure." The District Attorney's testimony included the following statement:
"... and I do recall, because it was so unusual is the reason I recall it, explaining to him in no uncertain terms that I don't pre-judge or make any decision about prosecutoral matters until I have the whole thing in front of me, ..."
However, according to Ledet, such communication is encouraged by his department. He testified that he often discusses cases with the District Attorneys for the surrounding parishes. Additionally, he testified that he did not seek a commitment as to whether the case would be prosecuted or not, rather he was merely seeking guidance on the case.
From that point forward, the investigation and subsequent arrest of the plaintiff were taken out of the hands of Ledet and *1202 turned over to another narcotics agent, James Benjamin. An arrest warrant was issued based upon the information gathered by Ledet, but sworn to by Officer Benjamin.
The affidavit indicated that TFC Ledet had obtained a written statement from Dr. Grover Baum regarding the diversion of Darvon Compound 65, 385 dosage unit total, on sixteen (16) occasions in 1987 by Ginger Taylor from Stroud's Tioga Pharmacy in Rapides Parish. Dr. Baum stated that he had not seen Ginger Taylor as a patient since August 29, 1986, and had no record or recollection of authorizing any medication for her since. The record indicates that the pharmacist at both Stroud's Pharmacy and Marcantel's Pharmacy advised Ledet that Taylor had a valid prescription for the three prescriptions which were filled by Taylor and which form the basis of the arrest warrant. The record also shows that Trooper Ledet had performed an investigation of William S. Stroud, III, and was aware that since at least January 5, 1988, Mr. Stroud and/or his employee were improperly issuing prescription for controlled dangerous substances. Ledet agreed to the statement that his investigation revealed that William S. Stroud, III, R.P.H., had dispensed massive dosages of controlled drugs and did so using numerous physicians named fraudulently. It appears from the record that Stroud had filled prescriptions for 65 people under similar circumstances indicating that the prescriptions were not properly authorized. The plaintiff is the only one of these persons charged with a crime. The Stroud investigation led to Stroud's pleading guilty to dispensing drugs illegally. When asked what fraud constituted the basis for the charge against the plaintiff, Ledet answered, "I have no answer. I can't produce one Judge."
The plaintiff was arrested in Grant Parish on February 24, 1988. She was booked with violation of LSA-R.S. 40:971(B)(b), "acquiring or obtaining possession of a controlled dangerous substance by misrepresentation, fraud, forgery, deception or subterfuge." Plaintiff posted bond and was released. The charges were dismissed by the District Attorney of Grant Parish.
This lawsuit followed. Plaintiff's petition alleged that she was wrongfully arrested on February 24, 1988; that the actions of Ledet and the State Police amounted to an intentional infliction of emotional distress, malicious prosecution; and, further, that the State had violated her rights of privacy in conducting unlawful searches and seizures of her pharmaceutical records from various health care providers.
After a two day bench trial, held on February 6 and 7, 1990, the trial court ruled from the bench, holding the State of Louisiana and Ledet liable to the plaintiff. He issued written reasons on July 30, 1990, wherein he awarded the plaintiff $530,000.00. The defendants appeal.

DISCUSSION
Plaintiff relies on several factors from which she alleges misconduct. First, plaintiff disputes Ledet's testimony that the statement, "Oh, if you'd please let me go this time, I'll never do it again," served as a reasonable basis from which Ledet could have suspected she was involved in any criminal activity. We agree. The Wal-Mart pharmacist, by deposition, gave no indication, other than the problem with the call-in prescription, of any reason to suspect that the plaintiff was involved in any wrongdoing. In light of the fact that the prescription was verified within a few hours, it is clear that plaintiff had done nothing wrong.
This statement could not form a reasonable basis for Ledet's deduction that she had done something wrong which she would not do again, since Ledet knew she was absolved from any wrongdoing. Accordingly, any suspicion generated by her statement is unfounded, unreasonable, and not the proper basis for the commencement of a criminal investigation of the plaintiff.
Plaintiff stressed to the trial court and on appeal, that Ledet proceeded in his investigation into pharmacy and physician records without appropriately obtaining search warrants or subpoenas. While Ledet did obtain subpoena duces tecums for *1203 hard copies of pharmaceutical computer records of K & B Drugs and Marcantel's Pollock Pharmacy, he did so only after the pharmacists informed him there were records for the plaintiff in the computer. Furthermore, there was evidence from which the trial court could conclude that the February 19, 1988, subpoena was not properly authorized.
Plaintiff also argued that Ledet was participating in the investigation to protect his own interest with regard to the separate lawsuit filed by the plaintiff stemming from the incident at Wal-Mart. Evidence introduced at trial indicated that Ledet was contacted on January 21, 1988, by plaintiff's attorney regarding the circumstances of the Wal-Mart arrest. Ledet admits he knew a lawsuit was forthcoming.

LIABILITY OF LEDET AND LOUISIANA STATE POLICE
The trial court did not provide findings of fact in its reasons for judgment. We, therefore, do not know what facts form the basis for its finding of an invasion of the plaintiff's right to privacy or an intentional infliction of emotional distress. Upon examination of the record, we conclude that the court reached the correct result in finding liability, but only under the theory of intentional infliction of emotional distress.

RIGHT TO PRIVACY:
The right to privacy embraces four different interests: (1) an invasion takes place by the appropriation of an individual's name or likeness for the use or benefit of another; (2) an invasion occurs when the defendant unreasonably intrudes upon the plaintiff's physical solitude or seclusion; (3) an invasion of privacy occurs through publicity which unreasonably places the plaintiff in a false light before the public; (4) an invasion of privacy takes place by the unreasonable public disclosure of embarrassing private facts. Jaubert v. Crowley Post-Signal, Inc., 375 So.2d 1386 (La. 1979); Ballaron v. Equitable Shipyards, Inc., 521 So.2d 481 (La.App. 4th Cir.), writ denied, 522 So.2d 571 (La.1988); Muslow v. A.G. Edwards & Sons, Inc., 509 So.2d 1012 (La.App.2d Cir.), writ denied, 512 So.2d 1183 (La.1987).
An actionable invasion of privacy occurs only when the defendant's conduct is unreasonable and seriously interferes with the plaintiff's privacy interest. For an invasion to be actionable, it is not necessary that there be malicious intent on the part of a defendant. Rather, the reasonableness of the defendant's conduct is determined by the balancing of conflicting interests at stake, i.e., the plaintiff's interest in protecting his privacy from serious invasions and the defendant's interest in pursuing his course of conduct. Jaubert, supra.
It is Taylor's contention that Ledet invaded her privacy by (1) investigating her prescription records; (2) verifying the prescriptions with the prescribing physician; and (3) showing her photograph in a photo-lineup to pharmacists in the course of his investigation. Under the facts of this case, we do not believe the conduct of Ledet in his criminal investigation of the plaintiff is an actionable invasion of privacy. Defendants sought to introduce testimony which would show the normal course of conduct for such an investigation. The trial judge ruled the evidence inadmissible. The trial judge was in error in excluding this testimony. The usual and customary course of conduct followed in investigations of this type is the core of this lawsuit. The evidence was relevant and should have been admitted. LSA-C.E. art. 102 and art. 401. Accordingly, we have considered this proffered evidence in reaching our decision.
Proffered testimony from Ledet and from Lt. Soileau indicate that the investigation into drug related criminal activity is basically a paper trail type of investigation and it is necessary to trace a prescription from pharmacy to pharmacy until the originating prescription from the physician is found. The physician of record is then contacted with regard to the validity of the prescription. Inasmuch as the investigation was conducted in the usual and customary manner, and noting that the record is void of any evidence of undue force or *1204 pressure used by Ledet in obtaining information from plaintiff's medical providers, we find that the trial judge was incorrect in determining that the actions of Ledet constituted an invasion of privacy.

INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS:
We recognize a legally protected right to be free from serious, intentional invasions of mental and emotional tranquility. The cause of action for intentional infliction of emotional distress as an independent tort was affirmed as viable in White v. Monsanto Co., 585 So.2d 1205 (La.1991). In White, the Louisiana Supreme Court, in accord with the American Law Institute's Restatement (Second) of Torts § 46, set out the following elements and criteria which must be established in order to recover under intentional infliction of emotional distress:
(1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct. White, 585 So.2d at 1209.
The element of extreme and outrageous conduct could be satisfied only by conduct so atrocious as to pass the boundaries of decency and to be utterly intolerable to the civilized society. The Court explained that the extreme and outrageous character of conduct "may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests." Id. at 1209-1210. Further endorsing the definition of the tort of intentional infliction of emotional distress contained in § 46 of the Restatement (Second) of Torts, the Court stated:
Liability can arise only where the actor desires to inflict severe emotional distress or where he knows that such distress is certain or substantially certain to result from his conduct. Restatement, supra, comment i, § 46. The conduct must be intended or calculated to cause severe emotional distress and not just some lesser degree of fright, humiliation, embarrassment, worry, or the like.
White, 585 So.2d at 1210.
This court, in Smith v. Mahfouz, 489 So.2d 409 (La.App. 3d Cir.), writ denied, 494 So.2d 1181 (La.1986), recognized and held that Louisiana law concerning damages for mental distress due to intentional acts, is that the defendant must have desired the result or realized to a virtual certainty that the result would occur. Recovery for mental anguish is limited to instances of outrageous conduct. In Smith, we held that the defendant acted outrageously in that he deliberately felled trees across the roadway in order to block the plaintiff's passage to his land upon which he had his home and place of business. The trial court's award of damages was sustained for the anxieties suffered by the plaintiff inasmuch as the defendant must have realized that the plaintiff would suffer anxiety over the possibility of fire in his aged buildings.
In the present case, evidently the trial court found that the defendant commenced an investigation of the plaintiff without reasonable suspicion and that he did so for his own purpose of making a case against the plaintiff in order to lessen the likelihood that he would be held liable for the incident which occurred at the Wal-Mart store. There is evidence from which the trial court could have concluded that this investigation was initiated for defendant's own purposes, rather than for the purpose of conducting a legitimate investigation.
In considering the outrageous character of Ledet's conduct in initiating the investigation, we consider the fact of Ledet's role as a narcotic detective. Ledet did not have a bona fide suspicion with which to put the criminal law in motion and eventually have the plaintiff arrested. His conduct was vexatious in using his authority and the legal process for the purpose of gaining information which would discredit the plaintiff in her Wal-Mart suit.
Furthermore, the trial court apparently found that Ledet's conduct was intentional or reckless and set out to cause severe emotional distress to the plaintiff. Although *1205 subjective intent can rarely be proven directly, in this instance, harmful intent can be presumed from the actions of Ledet. Given this fact, the trial court obviously found that Ledet realized to a virtual certainty that his actions would cause plaintiff to suffer anxiety and mental distress. At the very least, Ledet's actions indicated a reckless indifference to the likelihood of his actions causing the plaintiff emotional distress, although the ultimate objective of his investigation was to avoid any liability for the Wal-Mart incident.

ADDITIONAL DISCUSSION
We note first, as our brethren have previously observed, that in cases dealing with abuses in the criminal justice system, the determination of liability might best be approached using a more flexible and civilian oriented treatment under LSA-C.C. art. 2315, rather than working within categories of torts such as false imprisonment, malicious prosecution, or intentional infliction of emotional distress, etc. The use of these categories may sometimes impede rather than effectuate the civil law's basic principle of liability of damages caused by fault. Great caution is necessarily demanded in determining fault in the context of society's efforts to suppress crime. Reasonable efforts toward crime suppression should not be punished and, therefore, curtailed by civil liability for simple mistakes. However, the efforts must be reasonable; the individual remains obliged to act as a reasonable person would, taking into consideration all of the circumstances. Not every mistake in defending one's self or community against crime is actionable fault, but only such mistakes as is not reasonably justified by the surrounding circumstances. Whittington v. Gibson Discount Center, 296 So.2d 375, 377 (La.App. 2d Cir.1974).
We note further that the interest of every law-abiding citizen in being free from unwarranted or improper criminal investigation, is so great that almost every such investigation might be considered extreme and outrageous and might also be considered substantially certain to cause severe emotional distress. We do not intend that such a conclusion should be drawn from the decision we have reached and hold that liability would not be warranted in the present case in the absence of (1) an ulterior purpose on the part of the investigating officer; and (2) a willful act in the conduct of the investigation not proper in the regular conduct of an investigation.
This court recognized in the case of Vasseur v. Eunice Superette, Inc., 386 So.2d 692 (La.App. 3d Cir.), writ denied, 393 So.2d 747 (La.1980), that a cause of action lies for the common law tort of abuse of process:
The tort action for abuse of process has long been recognized at common law and several Courts of Appeal in this state (see trial court's opinion, above, for citations) have had occasion to discuss this heretofore alien action which is kindred to the tort of malicious prosecution. There seems to be no reason not to recognize a plaintiff's right to recover for damages caused by a defendant's abuse of process when the facts so warrant.
Unlike malicious prosecution, however, where several elementsincluding malice and probable cause3must be established for the plaintiff to prevail, there are only two essential elements of abuse of process. These are set forth in Law of Torts, Hornbook Series (3rd Edition), by William A. Prosser, at page 877:
"The essential elements of abuse of process, as the tort has developed, have been stated to be: First, an ulterior purpose, and second, a wilful act in the use of the process not proper in the regular conduct of the proceeding."
Vasseur, 386 So.2d at 695.
The first element, that of ulterior purpose, is similar to the concept of "malice," but is a much more demanding test which would not be met by a showing of lack of knowledge or other technical types of malice, but which is only met when the officer is acting for a specific purpose not authorized by law. The second criteria, improper use of process, refers to a failure to comply with the proper procedures or *1206 rules set out by law for conducting official actions.
In the present case, the trial court was justified in finding that the defendant did not follow proper rules of procedure as he initiated an investigation without reasonable suspicion, and was also justified in finding that he did so for an ulterior purpose, i.e., attempting to shield himself from possible civil liability.
In a case where these two elements are met, we feel that the action for intentional infliction of emotional harm or, indeed, for invasion of privacy, may properly lie without unreasonably compromising society's effort to suppress crime.

DAMAGES
The trial judge awarded the plaintiff the following:

Future psychiatric treatment.......$ 15,000.00
Time, expenses and arrangements
 necessary for plaintiff
 to obtain psychiatric
 treatment........................$ 15,000.00
General damages for past,
 present and future anxiety,
 distress and depression..........$500,000.00
 -----------
TOTAL DAMAGES......................$530,000.00

The trial judge, in his reasons for judgment, stated:
"Due to the careless and unprofessional conduct of Officer Ledet, Ms. Taylor was diagnosed as having post-traumatic stress syndrome, of moderate severity, caused or aggravated by the flagrant behavior of Trooper Ledet."
Three significant events which occurred to plaintiff must be noted before going into psychiatric evidence. First, the plaintiff had emotional and mental problems years before this incident. In June of 1980, plaintiff was hospitalized for taking twenty Elavils, classified as an "accidental" overdose. She was diagnosed with depression reaction with suicidal ideation and adjustment reaction of young adult life. She was referred to a mental health clinic by Dr. Joe Hayes.
Second, in 1985, the plaintiff was charged with manslaughter for the killing of her husband. She was tried in 1988, after the Wal-Mart incident, but before the action which forms the basis of this suit, and was acquitted.
Third, plaintiff, after the incident which forms the basis of this lawsuit, moved to Texas where her mother and step-father were living. While in Texas, plaintiff was stopped by a Texas law enforcement officer for an expired inspection sticker. According to plaintiff's testimony, the officer found a bottle of pills and a wine cooler in plaintiff's possession. He then took her to the police station for a "breath test." She was charged with "P.I." Plaintiff could not explain to the court what the charge of "P.I." constituted. In any event, she testified that she was required to furnish a prescription for the pills in her possession and upon doing so, the charges were dropped.
The plaintiff was diagnosed by Dr. Davidson H. Texada as having an adjustment disorder of adult life with anxiety and depression. This diagnosis is a type of anxiety and depression brought on by stress, formerly referred to as post-traumatic stress disorder. Dr. Texada was not aware of plaintiff's previous overdose history. He was also unaware of the incident with the Texas law enforcement officials. However, he was aware of the manslaughter trial and acquittal.
Dr. Texada based his opinion solely on the history that plaintiff related to him which consisted of the events surrounding plaintiff's shooting of her husband and subsequent trial and acquittal; the Wal-Mart arrest; and the arrest made the subject of this appeal. With regard to the events surrounding the shooting, apparently plaintiff called the Sheriff's Office in Grant Parish fifteen or more times to complain about the beatings her husband inflicted upon her. In an attempt to avoid another beating, she finally shot and killed her husband.
It was Dr. Texada's opinion that the role that "law enforcement" played in plaintiff's life, contributed to her neurosis. He also added the factors of raising four children without a father and the experience of an abusive and neglectful husband. He *1207 testified that plaintiff had related to him that she was in an anxious, depressive state during the marriage. He opined that her present condition resulted from her inability to handle and cope with these events, but was not actually caused by these events. He further was unable to separate the effects of any of the three events to isolate one situation which contributed more to her condition than any other. Finally, he testified that he had not set-up any long-term program, or regiment of therapy for her. He did state that he had previously recommended treatment, but that she had not followed his recommendation.
Dr. Paul D. Ware first saw plaintiff on March 25, 1990, at the request of defendants. Dr. Ware conducted an examination of the plaintiff and concluded that the plaintiff was suffering from post-traumatic stress syndrome in moderate severity. It was also his opinion that the arrests played a significant part in plaintiff's problems. He recommended an antidepressant and office visits weekly for three months. He stated that usually within three months, with this medication and supportive treatment, the visits can slack-off to once every two weeks for a period of three months. After this six month period, visits can be reduced to once per month. He estimated that the cost of this therapy would be approximately $2,400.00. He also stated that he did not think it was probable that the plaintiff would need to be placed in an inpatient unit for treatment. He further testified that he did not see in her any evidence that she was suicidal.
At the time of the trial, the plaintiff was 28 years old and had four children ranging from 6 to 12 years of age. She had a tenth grade education. She testified that Dr. Texada recommended that she move to Texas where her mother and step-father were living. She also testified that her mother wanted her to move there as well. She testified at length about the second arrest which took place at her home. She stated she was never in jail, but that she remained in custody approximately two hours.
Defendants called into question the plaintiff's credibility. Our review of the testimony elicited on cross-examination, lends some credence to the defendants' argument. We are satisfied that there is a significant amount of internal conflict in plaintiff's testimony, and also a significant amount of conflict between the testimony of plaintiff and the numerous medical providers. For instance, the plaintiff contends that she had a fear of doctors and pharmacists, yet upon moving to Texas, she frequently saw Dr. Johnson and continued to obtain and fill prescriptions for Darvon 65 and Valium until February of 1989. Accordingly, it was unreasonable for the trial court to conclude that she feared doctors or pharmacists.
In order to disturb the award of damages made by the trial court, we must determine that the record clearly reveals that the trial court abused its discretion. If the award is lowered, it can only be lowered to the highest point reasonable within the discretion of the trial court. Coco v. Winston Industries, Inc., 341 So.2d 332, 335 (La.1976). In determining if the award is excessive, prior awards may be looked to if the present award is shown to be greatly disproportionate to past awards for similar injuries. Reck v. Stevens, 373 So.2d 498 (La.1979). After reviewing the record in this case, we feel that the award given by the trial court was an abuse of discretion.
The award of $30,000.00 for future psychiatric treatment and expenses cannot be allowed. Plaintiff's petition made no allegation of any special damages and defendants' counsel objected timely to the testimony of Dr. Texada regarding this item. Accordingly, we cannot allow these specials as awarded by the trial court. We do note that the testimony of Dr. Ware with regard to the amount of $2,400.00 was not objected to and, accordingly, we will consider this in making a general damage award.
Post-traumatic stress disorder was explained by the 5th Circuit in Nicholas v. Voiron, 568 So.2d 1139, 1144, 1145 (La. App. 5th Cir.1990):

*1208 In layman's terms post-traumatic stress disorder, formerly traumatic neurosis, is the condition whereby, as a result of being subjected to trauma outside of the range of usual human experience, which has the potential for causing either physical injury or damage to one's integrity the victim develops physical and emotional symptoms of lasting proportion which in some measure debilitate or incapacitate his functioning on a day-to-day basis. Manifestation of the illness is compensable, but like any other item of damage, only when it is shown by a preponderance of the evidence to exist and to have been caused by the accident. Alphonso v. Charity Hosp. of Louisiana, etc., 413 So.2d 982 (La.App. 4 Cir. 1982); cf. Jordan v. Hubbard, 541 So.2d 211 (La.App. 4 Cir.1989).
Plaintiff cites several cases in her brief to support the $500,000.00 award. American Motorist v. American Rent-All, consolidated with Walton v. American Rent-All, Inc., 579 So.2d 429 (La.1991) and Miley v. Landry, 582 So.2d 833 (La.1991). However, the injuries suffered by the plaintiffs in these cases are in no way comparable to the injuries sustained by plaintiff in the present case, and are not representative of the awards made for injuries similar to the case sub judice. Although there is evidence to support the finding that the arrest compounded an already fragile condition, we find nothing in the record to support a judgment of $500,000.00. This award is inconsistent with the "emotional distress" the plaintiff received as a result of the conduct complained of. Therefore, we rely on Smith, supra, wherein a $14,000.00 judgment was awarded for plaintiff's emotional distress where the plaintiff suffered no physical injury.
We hold that an award of $40,000.00 is the highest award supported by our jurisprudence and award this amount in damages to the plaintiff. Accordingly, we reduce the plaintiff's award to $40,000.00.
Finally, we address Assignment of Error No. 5 regarding the ordering of the expungement of plaintiff's criminal record by the trial judge. The trial court, in its reasons for judgment, stated as follows:
"Further, any notations on Ginger Taylor's criminal record as a result of the subject of this litigation are ordered expunged and the State of Louisiana is ordered to return to Ginger Taylor or her lawyer any and all photographs and other material pertaining to her arrest."
However, he made no such order in his judgment. It is well settled that reasons for judgment form no part of the judgment. We note further that no such relief was prayed for by the plaintiff in her petition. Accordingly, the issue referred to in Assignment of Error No. 5 is not properly before us.
For the foregoing reasons, the judgment of the trial court is affirmed as amended. Defendants are cast in judgment for damages in the amount of $40,000.00.
Costs of this appeal are cast equally between the parties.
AFFIRMED AS AMENDED AND RENDERED.
DOMENGEAUX, C.J., dissents and assigns reasons.
DOMENGEAUX, Chief Judge, dissenting.
I respectfully suggest that the majority opinion is anomalous. It essentially concludes that Trooper Ledet's investigation was properly conducted and did not constitute an invasion of the plaintiff's privacy. Then, the majority goes on to hold that Trooper Ledet's investigation constituted an abuse of process which inflicted emotional distress upon the plaintiff. I disagree with both the legal maneuvers performed by the majority and some of its factual conclusions.
Concerning the privacy issue, the plaintiff argued that Trooper Ledet's actions constituted an invasion of privacy. The defendants argued, however, and the majority found, that the investigation was conducted in the usual and customary manner, necessitated a paper trail, and did not include any undue force or pressure by the officer in obtaining the information sought; *1209 thus, the majority concludes that Trooper Ledet's actions did not constitute an invasion of the plaintiff's privacy. I agree with this conclusion and suggest that the majority opinion should have stopped there.
Instead, the majority then analyzes the same investigation under the abuse of process doctrine, as outlined in Vasseur v. Eunice Superette, Inc., 386 So.2d 692 (La. App. 3d Cir.1980), writ denied, 393 So.2d 747 (La.1980), an opinion which I authored some years ago, and in which we found no abuse of process given the facts presented. The majority herein relies on Vasseur to find that the investigation, which it has already characterized as "conducted in the usual and customary manner," constituted an abuse of process which caused the plaintiff to suffer emotional distress.
The majority opinion is based on two factual conclusions: that Trooper Ledet's suspicion about the plaintiff is "unfounded, unreasonable, and not the proper basis for the commencement of a criminal investigation," and that the investigation was based on the officer's ulterior motive to shield himself from possible civil liability stemming from the incident at Wal-Mart. First, these factual conclusions were not articulated by the trial judge, as his ruling in favor of the plaintiff was made abruptly from the bench at the close of the case, before he had even read all of the evidence submitted. Such being the case, the majority opinion presumes what the judge was thinking and delves in rank speculation as to certain "facts" in order to justify its holding for the plaintiff.
Second, I disagree with the factual conclusions reached by the majority, but even if they were true, they are not of legal relevance. Concerning Ledet's suspicion about the plaintiff, I suggest that the officer's suspicion is a subjective thought that does not lend itself to an analysis of objectivity. Such a subjective, personal thought, based herein initially on a comment made by the plaintiff to Ledet, should not be used as a legal criteria to establish the validity of an investigation. Further, Ledet's "ulterior motive" to shield himself from civil liability, if that was in fact the case, was not malicious and was not shown to be the instigating factor of the investigation. Such a fringe benefit, even if it were a consideration in Ledet's mind, is not grounds for a finding of abuse of process.
Third, I must also disagree with the legal rationale adopted by the majority. Not only does the opinion serve to discourage and thwart recognized police procedures and investigations, but it also defies logic in its effort to condemn Trooper Ledet on the basis of presumption and speculation. If Trooper Ledet did not violate the plaintiff's privacy, and did no wrong in obtaining information from the plaintiff's medical providers, as found by the majority, it does not logically follow that he intentionally inflicted emotional distress on the plaintiff. Further, inasmuch as he acted properly, Ledet's underlying motive is immaterial. See Vasseur, supra.
This case should be reversed.
NOTES
[1] The record gives us no further information on the particulars of this verification.