680 So.2d 117 (1996)
Jay W. HOLT, III, et ux, Plaintiffs-Appellees,
v.
AETNA CASUALTY & SURETY CO., et al, Defendants-Appellants.
Donna B. McCARY, et al., Plaintiffs-Appellees,
v.
AETNA CASUALTY & SURETY CO., et al., Defendants-Appellees.
AETNA CASUALTY & SURETY CO. et al., Plaintiffs-Appellees,
v.
Alfred W. HATHORN, Jr., et al., Defendants-Appellees.
Nos. 28450-CA to 28452-CA.
Court of Appeal of Louisiana, Second Circuit.
September 3, 1996.
Rehearing Denied September 19, 1996.
Writ Denied December 6, 1996.
*120 Cook, Yancey, King & Galloway by Sidney E. Cook, Jr., Shreveport, Fulbright & Jaworski by Katherine D. Mackillop, Houston, TX, for Aetna Casualty & Surety, Co.
Comegys, Lawrence, Jones, Odom & Spruiell by John S. Odom, Jr., Shreveport, for Alfred W. Hathorn, et al.
James A. Mijalis, Charles W. Salley, Shreveport, for Dr. and Mrs. Hathorn.
Hayes, Harkey, Smith, Cascio & Mullens by J. D. Cascio, Jr., Monroe, for Seymour & Roth, et al.
Leon M. Pliner, Don R. Miller, Shreveport, for Jay Holt, III, et ux.
Sherburne Sentell, Minden, for Donna McCary, et al.
Before MARVIN, BROWN and STEWART, JJ.
STEWART, Judge.
This is an appeal taken by Aetna Casualty & Surety Co., and answered by Seymour & Roth, Inc. their Employers Reinsurance Co., and Dr. Alfred W. and Barbara Hathorn. The trial was split into three phases. In Phase I, the jury decided the issue of liability *121 and awarded damages[1]. In Phase II, the jury decided the insurance policy issued by Aetna to the Hathorns was in effect and not void. In Phase III, the jury found that Aetna had violated its duty of good faith and fair dealing and awarded damages and penalties. We affirm, in part, amend in part, and as amended render.

FACTS
Sidney Kent was an insurance producer, and had handled the Hathorn family's insurance needs since the late 1970's. The Hathorn's insurance account consisted of more than auto liability policies. Kent wrote all the insurance needs of the Hathorns, life, auto, etc. When Kent moved to a different insurance agency, the Hathorns followed. When Kent moved to Smith, Howard and McCoy (Smith) in 1981, he brought the Hathorn account with him. In May 1987 while Kent was working with Smith, USF & G insurance declined to renew the Hathorns' auto insurance due to a bad loss history. The Hathorns were placed in an assigned risk pool, and insured by Liberty Mutual Insurance Company, a surplus insurer. One year later, Kent left Smith, and joined Seymour and Roth. This agency was in Monroe, with Kent operating a satellite office in Shreveport.
When Kent left Smith he took with him an outline of the Hathorns coverage. It included the anniversary dates and types of insurance policies that the Hathorns had in effect. Kent contacted Dr. Hathorn in March 1989 when the renewal date for the Hathorns policies approached. Unable to recall the full details of the Hathorn account, Kent contacted Dr. Hathorn for family information, and relayed it to the Monroe office.
The applications required that the prospective insured supply Aetna with a complete "loss history." A loss history consists of prior accidents, traffic violations, non-renewals or discontinuation of insurance, for a specific number of years before application for coverage. The Auto Rite I and II policies had a time period of three years; the umbrella policy had a five-year disclosure period.
The Auto Rite I application requested coverage for two cars and a horse trailer. Kent listed two licensed drivers, the doctor and his wife Barbara. The loss history provided consisted of one not at-fault accident involving Dr. Hathorn, and denied that the Hathorn automobile insurance had been declined, canceled, or non-renewed in the three years preceding. The application failed to trigger any underwriting edits, and was cleared through Aetna's Metairie office.
The Hathorns eldest daughter, Velma, was added to the Auto Rite II application. Her loss history listed on the application included a not at-fault accident on July 28, 1987, and a speeding violation on April 27, 1987. Auto Rite II application questioned Velma's insurability as a "youthful principal operator." Aetna made an exception for the Hathorns, and the application cleared the Metairie office.
The third application, a personal umbrella policy, was submitted directly to Aetna's Metairie office. The drivers listed were Dr. Hathorn, Barbara, and Velma. The application represented that there were no losses on any primary or excess policy within five years exceeding $5,000, and that no liability coverage had been declined, canceled or non-renewed during the preceding five years. In addition to the applications, the Monroe office obtained motor vehicle reports (MVR) on the three Hathorns listed drivers.
On May 5, 1989, Aetna Auto Rite I & II policies were issued to the Hathorns. In April of 1989, between the application and issuance dates, Dr. Hathorn had a speeding ticket, and Velma had an accident. Later, in September, Dr. Hathorn received another speeding citation. On May 21, 1989, Aetna issued the umbrella policy.
On August 20, 1989, a 17-year-old son, Fred III, was added to the policy. Fred had been attending The Lighthouse Ranch, a Christian boarding school, in Hammond, Louisiana. He returned home in August to graduate from Kingston Christian Academy. The Hathorns, who belonged to Kings Temple Church, were very religious, and had *122 found that Captain Shreve was not a good environment for Fred. Fred was tested and found to have had Attention Deficit Disorder with congenital dyslexia. While Fred attended Captain Shreve, his parents tested him "anywhere from three months to six months to a year, to check for drugs and alcohol." The Hathorns throughout their testimony, adamantly denied any knowledge that Fred used drugs or alcohol.
In August 1989 when Fred was added to the policy, he was represented as an inexperienced youthful part-time operator. Therefore, Aetna did not request a MVR. In fact, Fred had been a licensed driver for at least one year with two at-fault accidents.
The loss history offered to Aetna failed to contain several accidents and traffic violations. Specifically, from May 1, 1986, until the May 1989 issuance dates, the Hathorn family had been involved in numerous auto accidents. Also, their auto liability insurance had been non-renewed due to their significant loss history. The Hathorns failed to notify Aetna of Fred's April 1987 at-fault accident, which happened before his being licensed. Velma was involved in a July 1987 not at-fault accident. USF & G nonrenewed their auto liability insurance in May of 1987. Dr. Hathorn was involved in a not-at-fault accident on November 16, 1987. In addition, Dr. Hathorn reported on the applications a not at-fault accident, when he had rear-ended another vehicle. Barbara Hathorn was involved in a not-at-fault accident on March 9, 1988. On June 29, 1988, Fred was involved in an at-fault accident caused by a failure to yield. Finally, Velma had an at-fault accident on September 4, 1988.
After Aetna issued the policies, and prior to their renewal, Fred had an accident November 1989 that the Hathorns reported to Aetna. Velma had an accident in April 1989, and an additional speeding ticket in 1989. Despite these additional problems Aetna renewed the policies in November 1989. On February 7, 1990, a new Chevrolet Blazer was added to the policy.
On February 27, 1990, at 4:00 p.m., Fred was driving the family's Blazer at a high speed in an easterly direction on East Flournoy Lucas Road. A passenger, Susan Holt, was riding with Fred. Fred, legally intoxicated, with a blood alcohol level measured at .23 crossed the centerline and collided with a west bound truck driven by Donna McCary. Fred and Susan were killed. Donna McCary survived severely injured.
Doctor and Mrs. Hathorn testified that they had seen Fred around 1:15 p.m. that day. They spoke to Fred and Susan for several minutes. When their conversation ended, Dr. Hathorn hugged Fred. Both of the Hathorns testified that they saw no indication of alcohol or that Fred was legally intoxicated.
Aetna received notice of the accident on February 28, 1990, and began its loss adjustment procedure. They paid Mrs. McCary's property and medical damages. Settlement negotiations began in 1990. Initially the Holts and the McCarys agreed to settle and release all parties for $1.4 million. Aetna acquiesced, but only if Kent's errors and omission insurer (E & O) paid 45% and Dr. Hathorn paid 10%. The E & O agreed to contribute $280,000 or 20%. Settlement negotiations crumbled.
On May 9, 1990, Aetna discovered a potential coverage question. Aetna sued Dr. Hathorn for a declaratory judgment in federal district court to have the policies voided because of misrepresentations. In addition, Aetna sued Kent's E & O for breach of contract and/or professional negligence. The action was dismissed, and refiled in state court on March 4, 1992. During that time, the Holts filed a wrongful death suit against the Hathorns and Aetna. The McCarys filed a personal injury suit against the Hathorns and Aetna, and the Hathorns sued Aetna for bad faith. All suits were consolidated for discovery and trial.
The Holts settled for $225,000, and released all parties of liability. The McCarys settled for $1.1 million but refused to release the Hathorns' of liability. The McCarys assigned their rights against the Hathorns to Aetna, which continued to prosecute the claim. Aetna and the McCarys agreed that the McCarys would receive 50% of any additional recovery against the Hathorns, and 40% of any additional recovery from the E & *123 O. However the settlement agreement also provided in the event the Hathorns were found to be covered under the policy, the McCarys "agree not to pursue any claim against the [Hathorns]." Therefore, Aetna eliminated the possibility of the Hathorns being liable for any judgment in excess of the settlement amount.
The trial began February 7, 1995, and was separated into three phases. Phase I consisted of Fred's allocation of fault for the automobile accident, and assessment of the damages suffered by the McCarys. The jury found Fred solely responsible for the accident, but did not award exemplary damages to the McCary because of Fred's intoxication. The jury returned a verdict of $1.6 million for Donna McCary.
Phase II consisted of Aetna's suit to void the policies, and to seek reimbursement of the settlement funds. The jury found that the representations made on the applications were material, but they were not false or misleading. Aetna testified that if this information had been revealed they would not have issued the policies. The jury concluded that the Hathorns did not intend to deceive Aetna. Therefore, the policies were not void. The jury found the Insurance Agents negligent in failing to reveal the Hathorn's loss history, or Fred's license status at the time of the applications. Aetna was found comparatively negligent (50% regarding Auto Rite I and 75% regarding Auto Rite II and the umbrella policy). Furthermore, the jury concluded that Aetna had waived its right to void the policies.
Phase III consisted of the Hathorn's suit against Aetna. The Hathorns sued Aetna for violation of 22:1220, breach of the duty of good faith and fair dealing. The jury concluded that Aetna had violated its obligation of good faith and fair dealing. The jury assessed damages at a total of $1.275 million, $400,000 in general damages, and $25,000 in special damages, and double in penalties ($850,000). On March 8, 1995, the trial court entered a judgment in favor of doctor and Mrs. Hathorn.
Aetna filed a motion for a judgment notwithstanding the verdict or, in the alternative, a motion for a new trial and a request for a remittitur. The motions were taken under advisement, and later denied by the trial court. On July 20,1995, Aetna took this suspensive appeal.

DISCUSSION

Assignment of error # 1:
Defendant-appellant contends that the jury was clearly wrong in finding that the Hathorns' representations made on the 1989 applications were not "false or misleading." The appellant asserts that the jury's conclusions were manifestly erroneous or clearly wrong. Therefore, they require that the Court conduct a de novo review of the record and redetermination of the factual issues.
The appellee asserts that the jury was correct in determining that the Hathorns made no false or misleading representations in the application. The jury resolved all questions of credibility in favor of the Hathorns. Admittedly, there were errors made on the three applications. However, there was no intention by the Hathorns to deceive or mislead on the applications. As the jury was not clearly wrong or manifestly erroneous, a de novo review is not an option. Furthermore, the Hathorns argue that Aetna incorrectly contends that the law requires de novo review.
In Rosell v. ESCO, 549 So.2d 840, (La. 1989), the Louisiana Supreme Court outlined the law applicable for the appellate court's review.
It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978); Canter v. Koehring, 283 So.2d 716, 724 (La.1973). See also, Sevier v. United States Fidelity & Guaranty Co., 497 So.2d 1380, 1383 (La.1986); West v. Bayou Vista Manor, Inc. 371 So.2d 1146, *124 1150 (La.1979); Davis v. Owen, 368 So.2d 1052, 1056 (La.1979); Cadiere v. West Gibson Products Co., 364 So.2d 998, 999 (La. 1978); A. Tate, "Manifest Error" Further observations on appellate review of facts in Louisiana civil cases, 22 La. L.Rev. 605, 611 (1962). The appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the finding in the trial court, but if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Arceneaux, supra at 1333, Watson v. State Farm Fire & Casualty Ins. Co., 469 So.2d 967 (La.1985). In the applying the manifestly erroneousclearly wrong standard to the findings below, appellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo. See, F. Maraist, The Work of the Louisiana Appellate Courts for the 1978-1979 TermA Faculty Symposium, Civil Procedure, 40 La. L.Rev. 761, 764 (1980); Comment, Appellate Review of facts in Louisiana Civil Cases, 21 La. L.Rev. 402, 412 (1961); Cf. Anderson v. City of Bessemer City, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969).
When the scope of review of findings of fact is based on determinations regarding the credibility of witnesses, then the manifest errorclearly wrong standard enunciated in Rosell, supra at 844, takes a greater deference to the trier of fact's findings. Although this court may have come to a different conclusion, if chosen to sit as the fact finder, that is not our role or goal in an appellate review. Rather, our objective is merely to decide whether the fact finder's conclusions were reasonable based upon the entire record. Rosell, supra.

DE NOVO REVIEW
Aetna contends that the jury's manifest error mandates a de novo review of the record, and redetermination of all factual issues by this court. In Ferrell v. Fireman's Fund Insurance Co., 94-1252 (La. 2/20/95), 650 So.2d 742, the Louisiana Supreme Court articulated the applicability of de novo review:
The Louisiana Constitution provides that the appellate jurisdiction of a court of appeal extend to law and facts. La. Const. 1974, Art. V. Sec. 10(B). This provision, resulting from Louisiana's history as a civilian jurisdiction, has been interpreted as giving an appellate court the power to decide factual issues de novo. The exercise of this power is limited, however, by the jurisprudential rule of practice that a trial court's factual findings will not be upset unless they are manifestly erroneous or clearly wrong. Nevertheless, when the court of appeal finds that a reversible error of law or manifest error of material fact was made in the trial court, it is required, whenever possible, to redetermine the facts de novo from the entire record and render a judgment on the merits.
Ferrell, supra, at 745. Aetna argues that Ferrell requires this court to redetermine the facts de novo from the entire record. Conversely, the Hathorns argues that Aetna raised no claim of legal errors in the fact finding process.
Where one or more trial court legal errors interdict the fact-finding process, the manifest error standard is no longer applicable, and if the record is otherwise complete, the appellate court should make its own independent de novo review of the record and determine a preponderance of the evidence.
Ferrell, supra, at 747. Aetna's argument continues that the jury committed manifest error in its first finding of fact in Phase II whether the representations at issue were "false or misleading." When the jury concluded that the representations were not "false or misleading" this error affected a material fact, distorting the balance of the *125 jury's findings in later phases of the trial, resulting in the necessity of de novo review.
On Phase II Special Interrogatory # 1, the jury concluded that Aetna failed to prove by a preponderance of the evidence that the misrepresentations were "false or misleading." The jury instructions required the jurors to decide that the Hathorns made the misrepresentations fraudulently. The jury's decided that between two competing versions of the events involved in the policy application process, they favored credibility toward the Hathorns. Where two permissible views of the evidence exist, the fact finder's choice between them cannot be manifestly erroneous. Mistich v. Volkswagen of Germany, 95-0939 (La. 1/29/96), 666 So.2d 1073. For the intermediate court's review, the issue is not whether the trier of fact was wrong, but whether the fact finder's conclusions were reasonable. Stobart v. State through DOTD, 617 So.2d 880 (La.1993).
The jury found that the representations made by the Hathorns regarding their loss history were not "false or misleading." Aetna asserts that the documents or objective evidence so contradicts the jury's findings that the appellate court may disregard the jury's factual determinations as manifestly erroneous, although the findings were based upon a credibility determination. Rosell, supra. Witness testimony clearly established that the three applications collectively failed to report many tickets, accidents, and a nonrenewal of their liability insurance.
However, as the appellee asserts, there was no evidence presented that any of the misrepresentations were made with the specific intention of misleading Aetna into issuing the insurance policies. Dr. Hathorn testified that he told Sidney Kent everything he could recall about his family's tickets and accident history during their one brief interview. Kent assured Dr. Hathorn that his statements would be checked against MVRs, which provided the same information as Dr. Hathorn.
After review of the entire record, we cannot conclude that a factual basis does not exist for the findings of the jury that the misrepresentations applied were not "false or misleading." It is clear from the record, that the jury did not consider Dr. Hathorns omissions to Kent to be deliberate attempts to conceal information known to be critical. State v. Martin, 558 So.2d 654 (La.App. 1st Cir.1990). We cannot conclude that the jury's finding was manifestly erroneous or clearly wrong requiring a de novo review.

Phase II Assignments of Error:
Aetna maintains the jury erred in finding that the Hathorns' misrepresentations were not intentional. Louisiana has mandated a standard to void or defeat insurance coverage. La R.S. 22: 619(A) provides:
... no oral or written misrepresentation or warranty made in the negotiation of an insurance contract, by the insured or in his behalf, shall be deemed material or defeat or void the contract or prevent it attaching, unless the misrepresentation or warranty is made with the intent to deceive.
Therefore, Aetna had the burden of proving two things by a preponderance of the evidence to void the policy. One, that the misrepresentations were material and two, Doctor or Mrs. Hathorn intentionally made misrepresentations on the applications, with the intent to deceive.
First, the jurors were asked whether the representations made by Alfred W. Hathorn, Jr. or Barbara Hathorn were material to Aetna. This court defined a material misrepresentation in Irving v. U.S. Fidelity & Guar. Co., 606 So.2d 1365 (La.App. 2d Cir. 1992). "In order for a misrepresentation on policy application to be considered material, its nature must be such that, had the truth been known, the insurer either would not have contracted or would have contracted only at a higher premium rate." The jury returned with an affirmative answer. There is no argument that the information concerning the Hathorn family's driving record during the three years before the application date was material. The real inquiry faced by the jury was to determine whether Doctor and Mrs. Hathorn intentionally deceived Aetna when items were omitted from the application. The jury's conclusions that the omission made on the applications were material was not clearly wrong or manifestly erroneous.
*126 Continuing, Aetna contends the jury erred in determining that the Hathorns' misrepresentations were material, but not made with the intent to deceive. Aetna argues that La. R.S. 22:619.A. makes intent to deceive a sine qua non, or indispensable condition, of materiality. Their argument continues that "the jury was properly instructed on this aspect of the law," and committed reversible error when it failed to follow that law. The jury instruction provided:
An insurance company can rescind a contract of insurance if the policy holder, either fraudulently or with the intent to deceive the insurer, makes representations in its application that materially affect the insurer's risk. `An insurer who asserts this special defense to avoid coverage has the burden of proving that there was a material misrepresentation and that it was made with the intent to deceive.'
Therefore, in this phase of the trial, the burden is on Aetna to prove by a preponderance of the evidence that the Hathorns made material misrepresentations and that such material misrepresentations were made with the intent to deceive Aetna.
Vol. VI, pg. 1284. According to La. R.S. 22:619 the insurer seeking to invalidate a policy ab initio must prove both materiality and intent to deceive. Jamshidi v. Shelter Mutual Insurance Co., 471 So.2d 1141 (La. App. 3d Cir.1985), citing Antill v. Time Insurance Co., 460 So.2d 677 (La.App. 1st Cir. 1984); Coleman v. Occidental Life Insurance Co., 418 So.2d 645 (La.1982).
The Hathorns admit that the misrepresentations were material. However, as cited above, materiality is not the lone threshold to invalidate an insurance policy. The second element is intent. We have often recognized the difficulty in proving intent to deceive, therefore we no longer require strict proof of fraud. Cousin v. Page, 372 So.2d 1231 (La.1979). "Intent to deceive must be determined from surrounding circumstances indicating the insured's knowledge of the falsity of the representations made in the application and his recognition of the materiality of his misrepresentations, or from circumstances which create a reasonable assumption that the insured recognized the materiality." Schexnaider v. Rome, 485 So.2d 245, 249 (La.App. 3d Cir.1986).
Aetna and the Hathorns both cite several cases where the courts found omissions to be material, and done with the intent to deceive. In Shelter Insurance Co. v. Cruse, 446 So.2d 893 (La.App. 1st Cir.1984), the applicant represented to the insurance company that he had not had any tickets or accident within the three years preceding. Based upon that information, Shelter issued an insurance policy. However Shelter had rejected Cruse four years prior because of excessive tickets. When Cruse was involved in an auto accident, he made a property damage claim and was paid on it. Shelter discovered that Cruse had made false statements on the application, and alleged that the policy was voidable, suing for return of the money. The court concluded that Cruse was aware of the importance of his driving record, and found that the statements were misrepresentations made with intent to deceive voiding the policy.
In Jamshidi, supra, the court of appeal reversed the trial court's ruling. The appellate court determined there was sufficient evidence to find material misrepresentations with the intent to deceive Shelter. The appellate court found that the insured's failed to report four speeding tickets, an accident, as well as, a year of probation within 20 months of the application. In addition, the insured failed to report a Louisiana license instead reporting a violation free Texas license.
Finally, in Davis v. State Farm Mutual Automobile Insurance Co., 415 So.2d 501 (La.App. 1st Cir.1982), the insured failed to accurately report on his application, eight tickets in the preceding three years. The trial court did not find that the insurer had proved the intent to deceive. The court of appeal reversed the trial court's findings, and found such omissions to be material and made with the intent to deceive State Farm. The insured was aware of the importance of a safe driving record as it related to high insurance premiums.
Each of the cases cited above follow the theme that the insured was aware of the benefits of a "better" driving record. The *127 insureds were trying to find insurance at the lowest rates and intentionally relayed false material information. Although the Hathorns did receive a reduced premium when they became insureds of Aetna, intent to deceive is not shown through these circumstances. The jury heard extensive testimony from the Hathorns and Sidney Kent. Kent had handled the Hathorns insurance needs since the 1970s. Dr. Hathorn believed that Kent had complete access to the Hathorns file. To Dr. Hathorn's knowledge, every casualty, loss, or ticket had been promptly reported to the insurance agents. Dr. Hathorn and Kent met on one occasion in March of 1989 to discuss the applications for insurance. He never directed Kent to apply to Aetna for automobile insurance, he simply relied upon Kent to find coverage for his family.
During the March 1989 meeting, Sidney Kent assured Dr. Hathorn that MVRs would be run on the three licensed drivers included on the application. Those MVRs revealed precisely the same two accidents and one ticket that Dr. Hathorn had advised Kent of during their meeting.
Mrs. Hathorn recalled two conversations with Kent. She testified that she notified Kent soon after Fred received his license in April 1988. She also arranged a prayer meeting on the importance of safe driving and the high cost of insurance. Based upon those conversations, Mrs. Hathorn believed that Fred was insured. Conversely, Kent did not recall Mrs. Hathorn telling him that Fred was licensed. He recalled the prayer meeting, but remembered a separate conversation on April 27, 1988, and was able to present documentation that Mrs. Hathorn had advised Kent that Fred had not received a license.
While Fred attended The Lighthouse Ranch, he was unable to drive. However, as soon as Fred returned, Mrs. Hathorn notified Kent to list Fred as a part-time driver. When Fred returned to Shreveport in of August 1989, Mrs. Hathorn testified that she refused to allow Fred to drive until they had proof that he was covered. Clearly, the jury was presented with two versions of testimony. The jury elected to credit the testimony of Doctor and Mrs. Hathorn. "When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact's findings ..." Ferrell, supra at 746. In our review of the record, we did not find that there are inherently unbelievable aspects of the Hathorns testimony. Therefore, we cannot conclude that the jury's conclusions were manifestly erroneous.
Aetna contends the trial court erred in its improper limitation of loss history evidence. At the beginning of phase II, the Insurance Agents objected to admitting a comprehensive loss history. The trial court ruled that evidence, statements or arguments made before the jury that included information on comprehensive claims would be excluded. As the court stated for the record, and the appellant's counsel concurred, Aetna's criteria for issuing a rating for liability insurance did not include a comprehensive claims history. Since a comprehensive claims history was not a part of Aetna's underwriting criteria, the trial court ruled that the excluded evidence was not relevant. La. C.E. Art. 401. There is no evidence in the record that the trial court abused its discretion. Any errors in the trial court's evidentiary rulings do not mandate a change in the result. This assignment is without merit.
Next, Aetna contends the jury erred in determining that the Insurance Agents did not intentionally fail to report the Hathorn loss history. Chris Roth of the Insurance Agents, testified that an agent would have a tendency to remember insureds who had filed numerous claims. Cindy LaSalle testified that Kent was very smart, quick, and knowledgeable in insurance matters. However, as the Insurance Agents noted, when LaSalle was questioned on the Hathorn's file, she was unable to remember details from the account. The jury was questioned, "Did Sidney Kent, Seymour, Roth & Kent and/or Seymour & Roth intentionally fail to report the Hathorns' complete loss history to Aetna?" The jury returned negative answers on each application. Clearly, there were two permissible views of evidence. The jury *128 found credibility in the testimony of Sidney Kent. This assignment of error is without merit.
Aetna asserts that the jury erred in finding that Kent did not intentionally withhold from Aetna the fact that Fred was a licensed driver. Barbara Hathorn testified that after Fred obtained his license in April of 1988, she contacted Sidney Kent and made him aware of the situation. Kent denied that he was ever aware of Fred's license status until August of 1989, when Mrs. Hathorn requested that he be added to the policy as a parttime driver. Immediately after their conversation, Kent added Fred to the Hathorns' auto insurance policy and increased the premiums. The evidence presented led the jury to conclude that Kent did not intentionally withhold Fred's license status. The jury concluded that Kent did not become aware of Fred's license status until August. Therefore, the jury was not clearly wrong, or manifestly erroneous in its conclusion. The assignment of error is without merit.
The following three assignments of error regard the jury instructions given at the conclusion of Phase II. As stated numerous times before, the factual findings of the jury are accorded great weight and may not be disturbed by the appellate court in absence of manifest error. Rosell, supra. However, if the verdict is based upon jury instructions that are faulty in a critical regard, the verdict is tainted and not entitled to a presumption of regularity. Wilson v. Nat. Union Fire Ins. of La., 27,702 (La.App. 2 Cir.1995), 665 So.2d 1252 citing Gonzales v. Xerox Corp., 320 So.2d 163 (La.1975). Appellate courts exercise great restraint before overturning a jury verdict on the suggestions that the instructions were so erroneous as to be prejudicial. Doyle v. Picadilly Cafeterias, 576 So.2d 1143 (La.App. 3d Cir.1991). The standard of review for the appellate court in determining whether an erroneous jury instruction tainted the verdict involves a comparison of the degree of error with the instructions as a whole and the circumstances of the case. Gunn v. Amica Mut. Ins. Co., 611 So.2d 805 (La.App. 3d Cir.1992), writ denied 613 So.2d 999 (La.1993). Therefore, the pertinent inquiry is whether the erroneous jury instruction misled the jury to such an extent that the jury was prevented from doing justice. Kessler v. Southmark Corp., 25,941 (La.App. 2d Cir. 9/21/94), 643 So.2d 345.
Aetna contends the trial court committed error by allowing the jury to "compare" the fault of the Insurance Agents and the "negligence" of Aetna. In addition, Aetna contends the trial court erred in allowing the jury to consider the issues of waiver and estoppel, and the jury's findings regarding those issues constitute legal error. The jury responded affirmatively to jury interrogatory # 7, 8, 9, 10 and 11. The Insurance Agents rely upon Steptore v. Masco Const. Co. Inc., 93-2064 (La. 8/18/94), 643 So.2d 1213. They contend that Aetna's failure to investigate constitutes a waiver of all rights.
The jury found the Insurance Agents were comparatively at fault with the submission of the applications for insurance. Aetna argues that they pled the fault of the agents as an alternative basis for recovery. As an insurance broker, the agents owed Aetna a fiduciary duty. Neustadter v. Bridges, 406 So.2d 738 (La.App. 4th Cir. 1981). As Aetna could not have been aware of any false or misleading information on the applications, the trial court erred in instruction to the jurors on the comparative fault of Aetna, and allowing the jury to assess that fault.
Waiver is the intentional relinquishment of a known right, power, or privilege. Tate v. Charles Aguillard Ins. & Real Estate, Inc., 508 So.2d 1371 (La.1987); Ledoux v. Old Republic Life Ins. Co., 233 So.2d 731 (La.App. 3d Cir.), cert. denied, 256 La. 372, 236 So.2d 501 (1970); Comment, Waiver and Estoppel in Louisiana Insurance Law, 22 La. L.Rev. 202 (1961). Waiver occurs when there is an existing right, a knowledge of its existence and an actual intention to relinquish it or conduct so inconsistent with the intent to enforce the right as to induce a reasonable belief that it has been relinquished. Tate, supra; Ledoux, supra.
As noted in Steptore, supra, it is well-established that an insurer is charged *129 with knowledge of the contents of its policy. Whereupon, the insurer becomes aware of facts which would cause a reasonable person to inquire further, the insurer is then subject to a duty of investigation. Failure to do so, constitutes a waiver of all powers or privileges which a reasonable search would have uncovered. Swain for and on behalf of Swain v. Life Ins. Co. of Louisiana, 537 So.2d 1297 (La.App. 2d Cir.1989) writ denied, 541 So.2d 895 (1989).
Aetna argues that the Hathorn loss history after the issuance of the policies did not indicate the magnitude of the Hathorns' unreported loss history. Aetna continues that even the addition of Fred, was not a significant notice of underlying facts which may have entitled them to void the policy, because Fred was represented as a newly licensed driver. The Insurance Agents reject this argument. Aetna had a computer interface system. The system received, analyzed, and accepted or rejected potential applicants. When the application was incomplete or unacceptable, a manual edit was required by an Aetna underwriter.
Aetna argues there was no estoppel. Equitable estoppel arises when one by his actions, or by his silence when he ought to speak, induces another to believe certain facts and the other relies on these facts to his prejudice. Aetna argues there was no evidence presented that Aetna was aware of the Insurance Agents' breach of any fiduciary obligations until after the loss occurred. The Insurance Agents argue that Aetna's silence and inaction after Fred was added to the Auto Rite II contract, estops it from voiding the contracts.
Adequate jury instructions are those that fairly and reasonably point up the issues and provide correct principles of law for the jury to apply to those issues. Fuller v. United States Aircraft Ins. Group, 530 So.2d 1282 (La.App. 2d Cir.) writ denied 534 So.2d 444 (La.1988), cert. denied 490 U.S. 1046, 109 S.Ct. 1954, 104 L.Ed.2d 424 (1989). The trial court is not required to give the precise instructions submitted by the litigants; it need only give the instructions that properly reflect the applicable law and adequately convey the issues to the jury. La. C.C.P. art. 1792; Fuller v. United States Aircraft, supra.
When we look to the instructions as a whole, and to the totality of the circumstances, we do not conclude that the trial court erred in instructing the jury on comparative fault, waiver, or estoppel. Furthermore, this is not an occasion where a party contends that the trial court omitted a necessary instruction or gave a completely wrong charge. See McDonough v. Royal Sonesta, 626 So.2d 438 (La.App. 4th Cir.1993). The trial court's jury instructions were representative of evidence presented throughout the entire record. Therefore, the appellants assignments of error are without merit.
The final assignment of error in phase II, is that the trial court erred in overruling Aetna's objection to an improper and inflammatory argument. Aetna argues that at the beginning of Phase II of the trial, the trial court advised both parties that the ability to pay would not be brought before the jury. Aetna contends that during the Phase II closing arguments, the Hathorns, over Aetna's objection, made the argument that a judgment against the Hathorns would subject their personal resources to liability for the Phase I judgment without the protection of insurance coverage. However, the Hathorns contend that at a sidebar conference, Aetna's objection was overruled, and the Hathorn's argument was approved with the trial court before the argument began. As the Hathorn's provide in their brief, Aetna's objection was properly overruled, and is within the trial court's broad discretion on such matters. Jordan v. Intercontinental Bulktank Corp., 621 So.2d 1141 (La.App. 1st Cir.1993). Therefore, any errors in the trial court's evidentiary rulings do not mandate a change in the result.

Phase III Assignments of Error:

La. R.S. 22:1220 Bad Faith and Fair Dealing
The appellant contends that the jury erred in finding that the Hathorns proved by a preponderance of the evidence that Aetna breached its obligation of good faith and fair dealing.
*130 The statute controlling the insurer's duty of good faith and penalties for breach of that duty is La. R.S. 22:1220 which provides in pertinent part:
A. An insurer, ... owes to his insured a duty of good faith and fair dealing. The insurer has an affirmative duty to adjust claims fairly and promptly and to make a reasonable effort to settle claims with the insured or the claimant, or both. Any insurer who breaches these duties shall be liable for any damages sustained as a result of the breach.
* * * * * *
C. In addition to any general or special damages to which a claimant is entitled for breach of the imposed duty, the claimant may be awarded penalties assessed against the insurer in an amount not to exceed two times the damages sustained or five thousand dollars, whichever is greater ...
To prevail on a claim of breach of duty, the insured must prove that the insurer knowingly committed actions which were completely unjustified, without reasonable or probable cause or excuse. Louisiana Maintenance v. Certain Underwriters, 616 So.2d 1250 (La.1993). Subsection (B) of the statute contains a detailed list of actions that if taken by the insurer, and proven that the insurer knowingly committed or performed is a breach of the insurer's duty. In bad faith actions, the insured is seeking extra-contractual damages, as well as, punitive damages. Therefore, the insured's burden is great.
Because we are faced with penalties as opposed to compensatory damages imposed on insurers and the breach of duty imposed upon them, we follow the interpretive jurisprudence on penal statutes, specifically guided by LSA-R.S. 22:658. See Haynes v. Shumake, 582 So.2d 959, 963 (La. App. 2d Cir.1991).
Penal statutes are to be strictly construed. Therefore, sanctions should be employed only in those instances where the facts negate probable cause for nonpayment. The party seeking damages must prove that the insurer's actions or failure to act were unjustifiable. Whether an insurer's actions warrant imposition of statutory penalties depends upon the facts of the case, as well as, those facts known to the insurer. As this is primarily a factual issue, the trial court's findings shall not be disturbed on appeal absent manifest error. Haynes, supra at 961.
In the instant case, the jury found that Aetna's actions from the initial report of the loss until the Hathorn's filed their reconventional demand, and by failing to timely settle the Holt and McCary claim, were clear representations of Aetna's arbitrary and capricious manner.
The jury heard repeated evidence of Aetna's actions towards the Hathorns. First, Aetna initiated the suit for declaratory judgment on May 9, 1990. That suit was dismissed, and in 1992 Aetna refiled in state court. In December of 1990, Aetna made an unsuccessful settlement offer with the McCary's for $1.1 million, but conditioned that offer on contributions from the E & O insurer, and the Hathorns, for 45% and 10%, respectively. Prior to the trial commencing, Aetna settled with the McCarys for 1.1 million, $400,000 less than the policy limits and the same amount offered in 1990. In addition to this settlement, Aetna took an assignment of the McCary's rights, agreeing to split in addition to the amount already recovered, and additional 50% against the Hathorn's and an additional 40% of anything recovered against Kent and his insurer. These details were not disclosed until a motion to compel was filed.
Aetna failed to secure a release of liability for the Hathorns. Instead, through the assignment, they prosecuted their claim against the Hathorns. In contrast, when Aetna settled the Holt suit for $225,000, they did procure a release for the Hathorns. Moreover, Aetna filed a coverage suit and amended its petition to seek reimbursement of the McCary settlement funds, in the event of a finding of noncoverage.
Originally, Aetna provided conflict counsel for the Hathorns. The counsel hired by Aetna was terminated and withdrew by written motion on October 11, 1994. The Hathorns argue that since Aetna had not exhausted its policy limits in the settlement *131 with the McCarys while suing its insured, it had a continuing obligation to discharge its policy obligations to the Hathorns and defend them. Gleason v. State Farm Mutual, 27,297 (La.App. 2d Cir. 8/23/95), 660 So.2d 137, 143. Had the Hathorns not provided their own defense for the three Phases of the trial, they would have been unrepresented.
Louisiana courts have recognized that insurance companies have a right to litigate questionable claims without being subjected to damages and penalties. Darby v. Safeco Insurance Company of America, 545 So.2d 1022 (La.1989). However, when the insurer arbitrarily and capriciously breaches its duty of good faith and fair dealing it has violated § 1220. The jury concluded that damages and penalties were due. Under the manifest error or clearly wrong standard, the issue to be resolved by the reviewing court is not whether the trial court's or jury's findings of fact were right or wrong, but whether the fact finder's conclusions were reasonable one. Stobart, supra. Consequently, we find no error in the jury's election, of this claim.

DAMAGES
Appellant alleges an award of $400,000 in general damages is excessive, Aetna asserts that the jury "... reacted with improper passion, prejudice and a punitive animus in making the award." The Hathorns argue that based upon the evidence presented in Phase III, the jury correctly decided to assess damages.

General Damages
The role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but to review the exercise of discretion by the trier of fact. The discretion vested in the trial court is "great," even vast, so that an appellate court should rarely disturb an award of general damages. Only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances of the case that the appellate court should alter the award. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La. 1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).
Our review of the record indicates the total amount awarded to the Hathorns for all items of general damages is so high as to constitute a clear abuse of the jury's discretion, regardless of how the jury reached that amount. The jury awarded Dr. and Mrs. Hathorn $400,000 in general damages for the past, present, and future emotional pain, suffering and distress. Special damages were awarded in the amount of $25,000. Despite the trier of fact's vast discretion in awarding general damages, we find the award made for the Hathorns total general damages was above the highest amount reasonably within the jury's discretion. Accordingly, the judgment must be amended to lower the award of general damages to the highest amount that the appellate court would have affirmed as reasonable. Foster v. Lafayette Ins. Co., 504 So.2d 82 (La.App. 2d Cir.1987), citing Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976).
As noted in Aetna's brief, the damages awarded to the Hathorns are disproportionate to those awarded to Donna McCary. At the conclusion of Phase I, Donna McCary was awarded $100,000 for past mental anguish and distress, and $10,000 for future mental anguish and distress. Ms. McCary's injuries consist of: 1) permanently crossed eyes, 2) inability to walk for six months, 3) unemployable, 4) distorted voice pattern, 5) weight gain in excess of 100 lbs. due to an inability to move, and 6) mental anguish associated with these types of injuries. The record reflects that there was medical evidence to support these claims.
Dr. and Mrs. Hathorn testified that their damages consisted of: 1) Mrs. Hathorn suffered an increase in the frequency and severity of migraines, insomnia, and nightmares. 2) Both developed high blood pressure during the course of the litigation. 3) Dr. and Mrs. Hathorn were prevented from properly grieving the loss of their son by defending the suit. 4) The Hathorn's marriage had broken up in June of 1994 under the stress of the suits Aetna filed against them. The Hathorns *132 failed to present specific medical evidence, besides Dr. Hathorn's testimony, to support their claims. Clearly, the Hathorns' complaints and damages fail to rise to the level of Ms. McCary's and the jury's award is an abuse of discretion.
The damages awarded to the Hathorns were four times greater than the award to the McCarys. This court does not question the award of damages, rather questions the excessiveness of this award in comparison to other verdicts held to be reasonable. In Hill v. Morehouse Parish Police Jury, 26,772 (La. App. 2 Cir. 4/7/95), 653 So.2d 244, the trial court concluded that $150,000 in general damages for the father of a 15 year-old boy who drowned after an automobile crashed into the bayou was deemed reasonable. The jury concluded that an appropriate award for her mental anguish was $63,000. A single mother watched her only child endure pain, respiratory distress, and die. In Re Medical Review Panel, Bilello, 621 So.2d 6 (La.App. 4th Cir.1993). In Taylor v. State, 617 So.2d 1198 (La.App. 3d Cir.1993), the plaintiff was arrested for drug related activities, causing emotional distress and post-traumatic stress syndrome. The trial court awarded $500,000 reduced to $40,000.
The jury clearly abused its discretion in an award of $400,000 in general damages to the Hathorns. Since this award is to be lowered, it can only be lowered to the highest point reasonable within the discretion of the trial court. Coco, supra at 335. In determining if the award is excessive, prior awards may be reviewed to determine, if the present award is shown to be greatly disproportionate to past awards for similar injuries. The Hathorns fail to cite any cases which support the $400,000 award. Although there is evidence to support the finding of entitlement to damages, it is not sufficient to support such an excessively high award. Reck v. Stevens, 373 So.2d 498 (La.1979). After reviewing the record in this case, we feel that the award given by the jury was an abuse of discretion.
We hold that an award of $25,000.00 is the highest award supported by our jurisprudence and award this amount in general damages to the plaintiff. Accordingly, we reduce plaintiffs-appellees' award to $25,000.00.

Special Damages
The jury awarded Dr. Hathorn $25,000 in loss of income. Aetna asserts that the trial court erred in allowing evidence of "loss of income" which was not pled specifically prior to the trial. The sole exception to the failure to specifically plead, would arise if the evidence was admitted without objection. At the beginning of Phase III, Aetna made a general objection to any expansion of the pleadings.
During Dr. Hathorn's testimony, Aetna failed to specifically object to Dr. Hathorn's testimony regarding loss of income. There is no evidence in the record that the trial court abused its discretion. Any errors in the trial court's evidentiary rulings do not mandate a change in the result. The award of special damages in the amount of $25,000.00 remains in effect.

Penalties
Aetna contends the jury erred in awarding penalties. Aetna correctly argues that § 1220 does not require the imposition of a penalty. Rather, subsection (C) provides that the claimant "may be awarded penalties...." The jury concluded at the close of Phase III that Aetna's failure to timely pay or settle the Hathorn's claim was a breach of the duty of good faith and fair dealing. The jury did not abuse its discretion in awarding penalties.
Continuing, Aetna argues that the jury erred in awarding $850,000.00 as the amount of penalties, and asserts that the imposition of the maximum penalty is an abuse of discretion. The appellant argues that the trial court assessed treble damages, totaling of 300%. Furthermore, they argue that this court should look towards La. R.S. 22:657(A), where the various circuits have held the maximum penalty is 100%.
Aetna's argument is without merit. Strictly construed, subsection (C) clearly provides that in addition to the damages sustained, the penalties cannot extend beyond double *133 the damages. The jury awarded the Hathorns $850,000.00 in damages, an amount double to the total damage award of $425,000. The jury did not err in assessing double the amount of damages. However, the penalties will be reduced accordingly to double the damages for Phase III. Therefore, damages are reduced to $100,000.
The final assignment of error relates to judicial interest. The judgment provided that legal interest on the penalties accrued from date of judicial demand. Aetna insist legal interest accrues from the date of legal judgment March 8, 1995. In the alternative, the Hathorns assert that legal interest is due from the date of the award February 20, 1995.
This court addressed the issue of judicial interest on award of penalties and attorney fees in Williams v. Louisiana Indemnity Co. 26,887 (La.App. 2 Cir. 6/21/95), 658 So.2d 739. After an exhaustive review, the court concluded "Until a judgment is rendered awarding attorney fees or penalties, a claim for those damages is unliquidated, that is, it is a claim that has not been determined either as to liability or damages." Williams, supra at 746. Therefore, the judgment of the trial court is amended to award interest on penalties from the date of judgment.

DECREE
The trial court's judgment is AFFIRMED IN PART, AMENDED IN PART, to reduce damages awarded to the Hathorns to $25,000.00 general damages, $25,000.00 in special damages, and $100,000.00 in penalties, and as amended RENDERED. Costs in these consolidated suits are assessed two-thirds against Aetna Casualty & Surety Company and one-third to the Hathorns.
BROWN, J., concurs with additional reasons.
*134 APPENDIX

*135 
*136 
*137 
*138 
*139 
*140 BROWN, Judge, concurring with additional reasons.
It is clear that neither Dr. Hathorn nor Sidney Kent reported to Aetna the "bad driving history" of the Hathorn family or the 1987 non-renewal by USF & G. It is equally clear that the information not disclosed was material. The jury's conclusion that the information was not false or misleading was clearly and manifestly wrong; nonetheless, to defeat or void the insurance contract, Aetna had to show that the false or misleading information was made with an intent to deceive. La. R.S. 22:619(A). To discern a person's intent, a fact finder can only look to the surrounding circumstances. In this case, there was substantial evidence suggestive of an intent to deceive concerning the loss history by both Dr. Hathorn and Kent; however, there was other evidence of Aetna's bad faith.
Aetna's settlement with the McCarys did not release Dr. Hathorn and, in fact, Aetna was assigned all of the McCarys' rights against Dr. Hathorn. Aetna agreed to give the McCarys 50% and 60% respectively of any additional recovery from Dr. Hathorn or the E & O insurer of Kent above the $1.1 million paid by Aetna. Thus, Aetna was not only proceeding against its insured to void the policies and recover the amount Aetna paid, but was also seeking to obtain an additional award, as assignee, against its insured for the damages of a third party.
The supreme court held:
[T]he protection afforded the insureds against this contingency (inappropriate settlements) is that in every case, the insurance company is held to a high fiduciary duty to discharge its policy obligations to its insured in good faithincluding the duty to defend the insured against covered claims and to consider the interests of the insured in every settlement. Pareti v. Sentry Indemnity Co., 536 So.2d 417, 423 (La.1988).
Although Aetna was seeking to have the policies declared void, no court had done so at the time of the settlement, and eventually, Aetna's attempt to defeat and void the policies was unsuccessful. Thus, Aetna continued to owe a "high fiduciary duty" to Dr. Hathorn.
The total settlement paid by Aetna to all plaintiffs ($1.325 million) was less than policy limits ($1.5 million). In settling with the McCarys, Aetna made no effort to avoid prejudicing its insured, Dr. Hathorn. In fact, Aetna acted deliberately to expose Dr. Hathorn to a large damage award in which Aetna would share.[1]
The settlement agreement evidenced bad faith by Aetna toward its insured. The effect of the agreement was that Aetna would pay less than policy limits, refuse to defend its insured, obtain an assignment of the claims of a third party (McCary) against its insured and thereafter, sue its insured for damages sustained by that innocent third party that exceeded the amount paid by Aetna to that third party.

APPLICATION FOR REHEARING
Before MARVIN, BROWN, WILLIAMS, STEWART and CARAWAY, JJ.
Rehearing Denied.
NOTES
[1] The juries verdict in Phase I was not appealed.
[1] Only if the jury found Aetna's policies not void, would the McCarys release the Hathorns. Thus, Aetna was protected both ways.