IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 21, 2009

Charles R. Fulbruge III
Clerk

No. 07-30823
cons w/No. 07-30868

DALE DICKERSON; SHIRLEY DICKERSON[*]

Plaintiffs-Appellees

v.

LEXINGTON INSURANCE COMPANY

Defendant-Appellant

Appeal from the United States District Court
for the Eastern District of Louisiana

Before KING, HIGGINBOTHAM, and WIENER, Circuit Judges.

WIENER, Circuit Judge:[**]

Plaintiffs-Appellees Dale and Shirley Dickerson sued Defendant-Appellant Lexington Insurance Company ("Lexington") for its failure to pay his homeowner's policy claim timely following Hurricane Katrina. After a one-day bench trial, the district court awarded Dickerson $175,467 in damages, penalties, and attorneys' fees and costs, ruling that Lexington acted in bad faith

---

[*] Shirley Dickerson, Dale Dickerson's wife and co-plaintiff in this lawsuit, died on January 15, 2006. The record does not reflect that her succession or her succession representative was ever formally substituted as a plaintiff or appellee herein. References in this opinion to "Dickerson" shall be to Dale unless otherwise specified.

[**] The original opinion in this case, published December 22, 2008, is withdrawn, and is replaced by this substitute opinion.

in violation of Louisiana statutes. Lexington appeals the judgment. We affirm in part and reverse in part.

## I. FACTS AND PROCEEDINGS

Dale and Shirley Dickersons' home in Marrero, Louisiana, was extensively damaged by Hurricane Katrina in August 2005. There was evidence of flooding throughout the first floor; Dickerson estimated that the water had risen to a level of approximately two feet inside his house. There was also evidence of extensive damage from wind and rain.[1] There was a hole in the roof. Furniture was warped and waterlogged. Carpets were moldy. An attic door had blown open exposing the crawl space to the wind and water. A light fixture on the first floor still contained an inch of water when the Dickersons returned home in mid-September following the storm.

The Dickersons held a homeowner's insurance policy issued by Lexington. That policy's four classes of coverage for wind damage and the limits of each were:

Coverage A (Building, i.e. home) - $153,000
Coverage B (Outbuildings) - $15,300
Coverage C (Contents) - $76,500
Coverage D (Additional living expenses) - $30,600

Like many homeowner's policies, the Dickersons' policy did not cover flood damage. They held federal flood insurance issued through a different carrier, which coverage paid $108,342 on their Katrina-related claim: $62,042 for damage to their home and $46,300 for damage to its contents.

The Dickersons notified Lexington of their wind damage claim under their homeowner's policy in mid-September 2005, and a Lexington insurance adjuster inspected the property on October 1. The adjuster wrote a report in November 2005, but also wrote a second report that he sent to Lexington on February 4,

---

[1] Henceforth we include both wind and rain when, for economy, we refer only to wind.

2006.[2] Lexington issued a check to Dickerson for $11,335 on March 2, 2006, indicating that it was for hurricane damage to the home under Coverage A.

Dickerson sued Lexington, claiming that it had breached the contract by failing to pay; and, additionally, that Lexington had breached its statutory duty of good faith through its unjustifiable failure to pay promptly and in full.[3] That suit was filed in May 2006. In June 2006, Dickerson sought additional payment from Lexington based in part on his claim that the structure of his home had been twisted in the storm. In response, Lexington sent a different adjuster to the property and eventually paid Dickerson an additional $2,200 under Coverage A. Finally, in May 2007, Lexington sent yet another adjuster to the Dickerson home who found that, in fact, the home had suffered far more wind damage than Lexington previously thought. That inspection resulted in a check to Dickerson for $103,756 in June 2007, about a month before the bench trial in this case.[4]

Lexington's response to Dickerson's lawsuit was that it had made a good faith effort to settle the claim, but that its adjusters had returned with conflicting information and had determined that the bulk of the home's damage was caused by flooding, thus falling outside the Dickersons' policy coverage. Lexington also contended that Dickerson had breached the insurance contract by failing to mitigate the damage to his home that had been caused by an improperly secured roof tarp and by failing to submit an itemized list of the damaged contents.

After a one-day bench trial conducted in July 2007, the district court held for Dickerson on all claims and entered a judgment for $122,362. The amount

---

[2] It is unclear whether the first report was sent to Lexington.

[3] Louisiana law requires insurers to act in good faith, including issuing payment within a statutorily prescribed timeframe. LA. REV. STAT. ANN. §§ 22:1220 ("§ 22:1220") and 22:658 ("§ 22:658") (2008).

[4] The check comprised $46,478 under Coverage A (home), $1,183 under Coverage B (outbuildings) and $56,095 under Coverage C (contents).

of the judgment included $50,000 in penalties under § 22:1220. Separately, the court awarded Dickerson attorneys' fees of $53,105, bringing the total award to $175,467.

Lexington timely appealed, contending that (1) there was insufficient evidence for a fact-finder to conclude that wind, rather than flooding, caused the subject damage to Dickerson's home and contents, (2) the trial court improperly calculated the value of the contents of Dickerson's home in violation of the terms of the insurance policy, (3) there was insufficient evidence to support a finding that Lexington had acted in bad faith, (4) § 22:1220 does not authorize recovery of mental anguish damages, (5) alternatively, there was insufficient evidence to support a determination that Lexington's bad faith actions had caused Dickerson mental anguish, and (6) attorneys' fees are impermissible under the applicable version of § 22:658.

## II. ANALYSIS

### A. Applicable Law and Standard of Review

When sitting in diversity, we apply the substantive law of the state.[5] In this case, we apply Louisiana law.

In the appeal of a bench trial, we review findings of fact for clear error[6] and conclusions of law and mixed questions of law and fact de novo.[7]

### B. Evidence of Wind Damage

---

[5] Trinity Universal Ins. Co. v. Stevens Forestry Serv. Inc., 335 F.3d 353, 356 (5th Cir. 2003) (citing Erie R.R. v. Tompkins, 304 U.S. 64 (1938)). Lexington removed the suit to the Eastern District of Louisiana on the grounds of diversity of the parties. Lexington is a citizen of Delaware and Massachusetts.

[6] Adams v. Unione Medtierranea di Sicurta, 364 F.3d 646, 655 (5th Cir. 2004) (citing Baldwin v. Stalder, 137 F.3d 836, 839 (5th Cir. 1998)).

[7] Am. Int'l Specialty Lines Ins. Co. v. Res-Care, Inc., 529 F.3d 649, 656 (5th Cir. 2008).

On appeal, Lexington asserts that there was insufficient evidence presented at trial to support the finding that wind, rather than flooding, caused most of the damage to Dickerson's home. As wind damage is covered by Dickerson's homeowner's policy but flood damage is not, Lexington would not be liable for any damage attributable to flooding.[8] None disputes that, in addition to flooding, both wind and rain caused damage, but the parties disagree on the proper apportionment of the causes of the damage between flooding and wind.

Under Louisiana law, the insured must prove that the claim asserted is covered by his policy.[9] Once he has done this, the insurer has the burden of demonstrating that the damage at issue is excluded from coverage.[10] Thus, once Dickerson proved his home was damaged by wind, the burden shifted to Lexington to prove that flooding caused the damage at issue, thereby excluding coverage under the homeowner's policy. As no one disputes that at least some of the damage to the Dickerson home was covered by the homeowner's policy, Lexington had to prove how much of that damage was caused by flooding and was thus excluded from coverage under its policy.

Dickerson's trial expert, a New Orleans general contractor, testified that wind and rain from the storm caused approximately 70 percent of the damage. The same percentage results when the estimated total value of damage to the home and its contents is reduced by the amount that Dickerson's flood insurer paid following Katrina, although Dickerson's expert also testified that he had not known the total amount that the flood insurance had paid until after he came up with his own estimate of the breakdown between the two causes of damage.

---

[8] At trial, an expert for the plaintiff testified that the total cost of repairing the home's wind and flood damage would exceed $177,000.

[9] Jones v. Estate of Santiago, 870 So. 2d 1002, 1010 (La. 2004); Comeaux v. State Farm Fire & Cas. Ins. Co., 986 So. 2d 153, 157-58 (La. App. 5th Cir. 2008).

[10] Jones v. Estate of Santiago, 870 So. 2d at 1010.

Lexington did not submit a competing percentage. Instead, it offered the testimony of its own adjuster who provided the court with estimates of rebuilding costs. Dickerson contended at trial that those costs were too low because they did not reflect inflated post-Katrina prices for materials and labor. Lexington also attempted to deconstruct Dickerson's expert's estimate by identifying individual components of the damage and assigning their cause to either flood or wind. For example, because flooding damaged the electrical wiring, Lexington maintained that the entire replacement cost of the wiring system throughout the house could be attributed to flooding. Dickerson's expert conceded that some of the figures in his estimate could be attributed entirely to flood damage, but insisted that he had accounted for that in calculating the 70-30 ratio.

At trial, the question of flood versus wind damage essentially turned on witness credibility, as the quantity and quality of the evidence adduced by each party was similar. The district court, as the finder of fact in a bench trial, is best positioned to evaluate the credibility of the witnesses. On this record, a reasonable fact finder could conclude that Dickerson's expert offered the more credible analysis of the damage to the home and the cost of rebuilding it. Finding no clear error, we defer to the determination of the district court and affirm.

C. Value of the Home's Contents

The contents coverage limit on Dickerson's policy, Coverage C, is $76,500. The district court valued Dickerson's damaged and destroyed contents at approximately $114,000.[11] As the limit of the policy's contents coverage is

---

[11] The origin of this figure is not entirely clear. Dickerson submitted the same itemized contents list to Lexington and his flood insurer. Our review of the list indicates that the replacement value of the contents either certainly or possibly damaged and destroyed by the hurricane was about $117,000. The total value of the contents on Dickerson's list, including flood damaged items, exceeded $205,000.

substantially less than the total value of the contents, the figure at issue here is the $76,500 coverage limit. By trial, Lexington had reimbursed Dickerson $56,005 for the loss of his possessions.[12]

Lexington contends that the district court misinterpreted the language of Coverage C. According to Lexington, the trial court's award of $20,495[13] under this provision ignores the fact that Lexington was entitled to withhold some portion of the proceeds of Coverage C until it received proof from Dickerson that he had replaced the damaged or destroyed items.[14]

The policy reads:

> When the replacement cost for the entire loss under this endorsement is more than $500, we will pay no more than the actual cash value for the loss or damage until the actual repair or replacement is complete.

To us, the language is quite clear: It permits recovery of only the actual cash value of an item until such time as the insured furnishes the insurer a receipt for replacement of that item. The actual cash value of an item is its depreciated value; presumably the replacement cost is higher. The insured is not entitled to the full replacement value of an item until he proves that he has, in fact, replaced that item.

---

[12] The district court's award of $20,495 under Coverage C was essentially the difference between the amount Lexington had paid and the coverage limit.

[13] There was some discrepancy in this figure. At trial, the parties stated that Lexington paid $56,095 to Dickerson prior to trial, which was $20,405 below the coverage limit, but the district court repeatedly referred to $20,495 as the amount awarded to bring Dickerson to the coverage limit. In its brief, Lexington states that it paid Dickerson $56,005 prior to trial, which comports with the trial court's understanding.

[14] Lexington adds that Dickerson failed to comply with his policy by not promptly submitting a list of damaged personal property or receipts for replacement of that property. Lexington seems to offer the latter argument not as a stand-alone complaint, but in support of its contention that the district court erred. Nevertheless, Dickerson did submit a list on May 10, 2007, shortly before trial. Lexington thereafter issue a check to Dickerson for $56,005.

According to Lexington, the district court erroneously calculated the amount owed to Dickerson under Coverage C by using the replacement value rather than the actual cash value, resulting in an excessive award for which Dickerson had never provided the required substantiation.  Lexington argues that, by using the replacement value instead of the actual cash value, the district court over-estimated the compensable value of Dickerson's possessions and awarded him too much. As evidence that the district court employed the wrong value, Lexington claims that the district court's $114,000 baseline value represented the replacement value of the contents of the home rather than the actual cash value; Lexington does not expressly address the $114,000 figure in its brief.  Lexington also seems to rely on its approval of only $77,765 in contents coverage of the total that Dickerson submitted as evidence that the district court got it wrong; yet it neither offers an explanation for what this figure represents nor contends that this is the total replacement value of Dickerson's possessions.

We are unable to determine the bases of Lexington's claim of error and, regardless, find the contention that the district court relied on the replacement value rather than the actual value to be a distinction without a difference.  Even assuming that $114,000 was the aggregate replacement value, the court only awarded Dickerson an amount sufficient to bring him up to the $76,500 limit of his contents coverage, or 67 percent of the value of his possessions.  At trial, Lexington's claims adjuster testified that the depreciation rate its adjusters use to calculate actual value is 20 percent[15] which, when applied to $114,000, produces a result identical to the award.  Under both calculations, Dickerson will receive the coverage limit.[16]  Lexington has neither provided evidence that the

---

[15] Dickerson's lawyer represented that Lexington actually used 28 percent to calculate depreciation, but the witness seemed unfamiliar with the higher rate so we use the lower rate for the sake of argument.

[16] Using Lexington's depreciation rate, contents valued at $114,000 would be depreciated to $91,200, so Dickerson would receive $76,500, his policy's coverage limit and the

district court relied on an erroneous amount nor demonstrated harm from the purported error. We affirm the award of the district court.

## D. Bad Faith of the Insurer

Under § 22:1220, an insurer owes its policyholders a duty of good faith in settling claims. Breach of the duty exposes an insurer to liability for damages, discretionary penalties, and attorneys' fees via § 22:658.[17] Among the enumerated breaches of § 22:1220's duty of good faith is failure to pay a claim within 60 days following receipt of satisfactory proof of loss if that failure is "arbitrary, capricious, or without probable cause."[18] In contrast, § 22:658 subjects the insurer to penalties and attorneys' fees for its arbitrary and capricious failure to pay a claim within 30 days.[19] A plaintiff may be awarded penalties under only one of the two provisions, §§ 22:1220 and 22:658, whichever amount is greater.[20] He may, however, seek attorneys' fees under § 22:658 while seeking damages and penalties under § 22:1220.[21]

A plaintiff has the burden of proving that his insurer (1) received satisfactory proof of loss, (2) failed to pay within the required time, and (3) acted

---

same result reached by the district court.

[17] Calogero v. Safeway Ins. Co. of La., 753 So. 2d 170, 174 (La. 2000). Calogero was decided before the § 22:658 amendment at issue in this case went into effect. At the time of that decision, the statute permitted attorneys' fees just as it does now. The language permitting attorneys' fees was expunged in 2003 and reinserted in 2006.

[18] § 22:1220(B)(5) and (6).

[19] § 22:658(B)(1); see also Reed v. State Farm Mut. Auto Ins. Co., 857 So. 2d 1012, 1021 (La. 2003).

[20] Calogero, 753 So. 2d at 174. In the instant case, the court assessed penalties against Lexington under § 22:1220 only.

[21] Calogero, 753 So. 2d at 174.

in an arbitrary and capricious manner.[22] "Arbitrary and capricious" has virtually the same meaning under § 22:1220 as it does under § 22:658;[23] courts interpret the phrase as synonymous with "vexatious."[24] "'[V]exatious refusal to pay' means unjustified, without reasonable or probable cause or excuse."[25] An insurer does not act arbitrarily and capriciously, however, when it withholds payment based on a genuine (good faith) dispute about the amount of a loss or the applicability of coverage.[26]

Lexington makes two assertions in this context. First, it contends that the district court erred by requiring it to prove that it acted in good faith because it is the plaintiff who must prove that the insurer acted in bad faith. Second, Lexington contends that the evidence offered by Dickerson was insufficient to prove that Lexington acted arbitrarily and capriciously. We address Lexington's assertions in turn.

1. Burden of Proof

We review de novo the district court's assignment of the burden of proof.[27] Lexington invites our attention to an exchange between its attorney and the court at the close of the bench trial during which the district judge observed that the plaintiffs had not shown that Lexington's actions were intentional and asked Lexington for evidence that it had acted in good faith. Lexington interprets the court's statement to mean that the district judge believed Lexington had to prove

---

[22] Talbert v. State Farm Fire & Cas. Ins. Co., 971 So. 2d 1206, 1211-12 (La. App. 4th Cir. 2007); DeSoto v. Balbeisi, 837 So. 2d 48, 51 (La. App. 1st Cir. 2002) (addressing version of § 22:658 that permitted attorneys' fees).

[23] Calogero, 753 So. 2d at 174.

[24] Reed, 857 So. 2d at 1021.

[25] Id.

[26] Calogero, 753 So. 2d at 173.

[27] Broussard v. State Farm Fire & Cas. Co., 523 F.3d 618, 625 (5th Cir. 2008).

that it had acted in good faith, instead of Dickerson having to prove that Lexington acted in bad faith. We have reviewed the transcript of the exchange in question and we cannot agree with Lexington's interpretation.

First, the statutes in question do not require proof that the insurer intentionally harmed the plaintiff. In this respect, the district judge merely stated a fact. In support of its insistence that Dickerson had to prove that Lexington acted in bad faith, Lexington cites Holt v. Aetna Casualty & Surety Company, in which the court stated, "[t]o prevail on a claim of breach of duty, the insured must prove that the insurer knowingly committed actions which were completely unjustified, without reasonable or probable cause or excuse."[28] As knowingly committing particular unjustified actions is not synonymous with knowingly harming the insured, Lexington's argument misses the mark. To the extent that the statute requires an intentional or knowing act, it is to prevent the imposition of penalties on insurers who have, by accident or oversight, failed to pay within the statutory period. This is to say that the statute requires the insurer to intend its actions; we do not however read Holt as requiring an insured to prove that his insurer intended to harm him.[29] Even though Holt is a correct statement of the law, it does not provide support for Lexington's position.

Additionally, we disagree with Lexington's conclusion that the district court's statement was an assessment of which party must bear the ultimate burden of proof. In context, the better reading is that the district court believed that the plaintiff had borne his burden, so it sought Lexington's rebuttal. The

---

[28] Holt v. Aetna Cas. & Sur. Co., 680 So. 2d 117, 130 (La. App. 2d Cir. 1996) (emphasis added).

[29] Indeed, in statutes that do have such a requirement, the wording is explicit such that this court need not hunt for meaning in the text. See, e.g., LA. CIV. CODE ANN. ART. 1998 (2008).

exchange came after both sides had concluded their cases. Before it uttered the statements with which Lexington takes issue, the court cited examples of Dickerson's evidence of Lexington's having acted in bad faith. Although the insured has the burden of proof under §§ 22:1220 and 22:658, once he has made his case, the burden of persuasion shifts to the insurer to rebut the insured's showing. The timing and context of the discussion between the court and the defense attorney lead us to conclude that Lexington misinterprets the exchange and that the district court was only inviting Lexington to offer evidence in its defense.

2. Sufficiency of the Evidence

Again, to demonstrate arbitrariness or capriciousness, Louisiana law requires a plaintiff to show that his insurer acted unjustifiably and unreasonably. The statute is not intended, however, to prevent insurers from disputing claims in good faith, including litigating such disputes.[30] A refusal to pay the full amount claimed will not be arbitrary and capricious when the dispute has a good faith basis.[31] Some delay to allow the insurer to verify a claim may also be permissible.[32] Without more, an insurer's payment of less than the full value of an insured's loss is insufficient evidence of arbitrary and capricious behavior for purposes of §§ 22:1220 and 22:658.[33] Similarly, an

---

[30] La. Bag Co., Inc. v. Audubon Indem. Co., ___ So. 2d ___, 2008 WL 5146674, at *7 (La. Dec. 2, 2008); Holt, 680 So. 2d at 131 (citing Darby v. Safeco Ins. Co. of Am., 545 So. 2d 1022, 1028 (La. 1989)).

[31] Pendarvis v. Am. Bankers Ins. Co., No. 06-772-DLD, 2008 WL 2280235, at *7-8 (M.D. La. 2008) (holding no violation of § 22:1220 where insured and insurer engaged in continuing negotiation over the value of the loss following Hurricane Katrina, and insurer continued to respond promptly to insured's inquiries), appeal docketed, No. 08-31064 (5th Cir. Oct. 29, 2008).

[32] Block v. St. Paul Fire & Marine Ins. Co., 742 So. 2d 746, 753-54 (La. App. 2d Cir. 1999).

[33] Gates v. Auto Club Family Ins. Co., No. 06-4394, 2007 WL 1464259, at *4 (E.D. La. 2007). Partial payment in Gates was the difference between the insurer's tendered amount

insured who fails to provide his insurer with information required to process his claim cannot then claim the insurer acted arbitrarily in delaying payment.[34]

Dickerson's bad faith claim hinges on the undisputed timing of Lexington's first inspection and payment. Dickerson had reported the damage to the insured property in mid-September of 2005, and Lexington had sent an adjuster to inspect the damage on October 1, a month after Katrina. A report based on this inspection was sent to Lexington no later than November, yet no payment was made. Another report was sent to Lexington (apparently by the same claims adjuster) on February 4, 2006. Although Lexington representatives took the position that the second report corrected a "mistake" in the November report, we have found no explanation in the record for why Dickerson could not have been compensated in the interim. Indeed, Lexington's attorney stated at trial that he had no explanation for the five-month delay. In its brief, however, Lexington states that its adjuster revised the first report to account for rising construction costs attributable to Katrina's aftermath. Dickerson did not receive the payment of $11,335 until March 2, 2006 — five months after the inspection and four months after Lexington received the inspection report.[35] Another inspection in the spring of 2006 produced an additional $2,274 payment, again a mere fraction of the aggregate $300,000 limit of Dickerson's homeowner's coverage. It was not until the eve of trial, following a third inspection and more than a year and a half after Katrina struck, that Lexington finally acknowledged that the insured

---

and the plaintiff's contractor's estimate of the total cost of repairs. In contrast, in Pendarvis, the partial payment was the insurer's tender of the undisputed lesser amount of the claim for which insurer agreed it was liable while the full amount of the claim was being negotiated.

[34] Block, 742 So. 2d at 752.

[35] That payment also included $718 for damage to other structures on the property and $1,874 for additional living expenses. Lexington apparently paid Dickerson another $1,000 for additional living expenses in October, but payments of additional living expenses have no bearing on our analysis.

property had suffered substantial wind (as opposed to flood) damage and made a substantial payment.

Lexington insists that it had a good faith dispute with Dickerson over how much of the damage to the house and its contents was caused by flooding rather than by wind. The existence of such a dispute is not supported by the evidence. The insurer has pointed to nothing evidencing that it told Dickerson it was disputing his claim on the basis of flood damage; it offers no evidence of a dialogue with Dickerson over the quantum of the damage. Neither has Lexington provided evidence that its adjusters and engineers had difficulty assigning a portion of the damage to wind, and we have found no evidence in the record to indicate that Lexington informed Dickerson that it was making or could not make such a determination. Dickerson's daughter testified at trial that she and her brother repeatedly called Lexington about the insufficiency of the payment but never got a response. The second inspection of the home did not take place until June 2006, well after the long-delayed payment was made, and even then resulted in payment of only $2,274. Given the lack of evidence of a bona fide dispute and the fact that the extent of the flooding was self-evident, we cannot credit Lexington's contention that its payments totaling about $17,000 on damage valued at seven times that much (exclusive of the flood insurer's payment) was the result of a good faith dispute.

The district court applied the proper legal standard. It sought evidence of a basis for Lexington's delayed payments and later stalling, but could find none.[36] The court's finding about whether Lexington's dispute was in good faith is a factual determination that we review deferentially. Even if Lexington considered the damage to be much less than Dickerson claimed, it was aware

---

[36] "[D]irect and positive evidence of vexatious refusal is not necessary to impose the statutory penalty." La. Bag. Co., 2008 WL 5146674, at *13 (quoting 14 COUCH ON INSURANCE 3D § 204.108).

that it owed some substantial amount, albeit a lesser one; yet it did not pay Dickerson for five months following its first adjuster's inspection. The fact that, in the district court's words, Lexington "all of a sudden decided or realized" on the eve of trial that it owed an additional $46,479 under Coverage A — not to mention amounts that it owed under other coverages — is further evidence that Lexington's earlier failure to pay was without probable cause. Lexington did have a credible argument with respect to the contents claim, and the trial court found that Lexington did not act capriciously in that regard. The district court's determination that Dickerson proved Lexington's bad faith based on its arbitrary and capricious withholding of payments under the policy's Coverage A for the dwelling was a conclusion of fact, which we review under the deferential clear error standard. Finding none, we affirm.

E. Mental Anguish Recovery Under § 22:1220

Insurance contracts in Louisiana, such as the policy at issue here, are regulated by both the Louisiana Civil Code and Title 22 of the Louisiana Revised Statutes. The Civil Code provides the general law of contracts, and Title 22 fills in the specifics that are applicable to contracts of insurance. Lexington claims that the intersection of these two sources of law works to bar recovery of damages for mental anguish by policyholders who claim their insurers have acted toward them in bad faith. We conclude to the contrary.

1. Permissibility of Mental Anguish Damages as a Matter of Law

Lexington contends that Civil Code Article 1998 bars recovery of mental anguish damages for breach of contract.[37] Such damages are recoverable for

---

[37] Article 1998. Damages for Non-pecuniary Loss

Damages for Non-pecuniary loss may be recovered when the contract, because of its nature, is intended to gratify a Non-pecuniary interest and, because of the circumstances surrounding the formation or the nonperformance of the contract, the obligor knew, or should have known, that his failure to perform would cause that kind of loss.

breach of contract only if (1) the primary object of the contract is non-pecuniary, or (2) the defendant's conduct was intended to aggrieve the plaintiff.[38]  As neither was the case here, argues Lexington, Dickerson cannot recover for mental anguish suffered as a result of the insurer's delays and denials.

We have previously observed that § 22:1220 requires an insurer to act in good faith by fairly and promptly adjusting and paying claims.  This statute identifies a half dozen per se breaches of the duty of good faith, including arbitrary or capricious failure to pay a claim within 60 days following receipt of satisfactory proof of loss.[39]  The statute specifies that "[a]ny insurer who breaches these duties shall be liable for any damages sustained as a result of the breach."[40]  Lexington maintains that this broad language is negated by the Art. 1998's proscription of damages for non-pecuniary harms outside of its confines. Lexington reasons that, because Art. 1998 governs all breaches of contract, and the Civil Code creates the lens through which the revised statutes are to be viewed, the Code article sets the limits of § 22:1220's governance of one kind of contract, viz., insurance contracts.  According to Lexington's argument, because the object of a home insurance contract is the payment of money — placing it outside the first prong of Art. 1998 because it is intended to gratify a pecuniary interest — Art. 1998 would only permit mental anguish damages if the insurer intended to harm the insured.

---

Regardless of the nature of the contract, these damages may be recovered also when the obligor intended, through his failure, to aggrieve the feelings of the obligee.
LA. CIV. CODE ANN. ART. 1998.

[38]  Id.

[39]  § 22:1220(B)(5) (2008).

[40]  § 22:1220(A).

We have not previously addressed the interaction of Civil Code Art. 1998 and § 22:1220. Neither has the Louisiana Supreme Court squarely addressed this issue. Lexington nevertheless contends that the recent Louisiana Supreme Court decision in Sher v. Lafayette Insurance Company resolved the issue.[41] Although we agree that the Sher decision lends some support to Lexington's argument, it is hardly determinative. The court essentially left for another day the question posed here. In Sher, the trial court had refused to give a jury instruction on mental anguish damages under Civil Code Art. 1998; the discussion does not mention § 22:1220. The intermediate appellate court affirmed that ruling, finding no error because the ruling had no impact on the trial's outcome. The Louisiana Supreme Court affirmed, concluding the trial court's error, "if any," was harmless. In so holding, the court stated that "there was no legal basis for the jury to have found damages for mental anguish."[42] The court did not elaborate on this statement.

Several other courts also have viewed the Sher decision as inconclusive with respect to mental anguish damages under § 22:1220.[43] In Gaffney v. State

---

[41] Sher v. Lafayette Ins. Co., 988 So. 2d 186 (La. 2008).

[42] Id. at 203.

[43] Gaffney v. State Farm Fire & Cas. Co., No. 06-8143, 2008 WL 4656926, at *1 (E.D. La. 2008). The Gaffney court stated that Sher "simply held that the plaintiff *in that particular case* failed to provide sufficient evidence to recover mental anguish damages pursuant to Louisiana Civil Code Article 1998 ... the Supreme Court made no ruling one way or the other under Section 22:1220 as to whether damages for mental anguish are recoverable as general damages." Id. See also Burgess v. Allstate Ins. Co., No. 07-248-JJB, 2008 WL 5121962, at *4 n.46 (M.D. La. Dec. 5, 2008) (stating that Sher is not dispositive on the permissibility of mental anguish damages under § 22:1220); Creecy v. Metro. Ins. Co., No. 06-9307, 2008 WL 4758625, at *2 (E.D. La. Oct. 30, 2008) (finding mental anguish damages permissible under § 22:1220 after Sher); Farber v. Am. Nat'l Prop. & Cas. Co., No. 08-821, 2008 WL 5159207, at *7 (La. App. 3d Cir. Dec. 10, 2008) (same). Cf. Juneau v. State Farm Fire & Cas. Co., No. 08-1238, 2008 WL 5234405, at *4 (E.D. La. Dec. 12, 2008) (finding Sher barred mental anguish damages recovery under § 22:1220); Barrow v. State Farm Fire & Cas. Co., No. 07-5603, 2008 WL 4412259, at *2 (E.D. La. Sept. 18, 2008) (same); see also Copelin v. State Farm Ins. Co., No. 06-4115, 2008 WL 4587306, at *2 (E.D. La. Oct. 10, 2008) (stating that Sher should guide

Farm Fire & Casualty Co., the district court stated that the Sher ruling was limited to the specifics of that case and did not address the availability of damages vel non for mental anguish under § 22:1220. A review of the case law shows that the appellate courts of Louisiana and the district courts of this circuit have regularly permitted mental anguish damages for a breach of § 22:1220. Louisiana appellate courts have not been uniform in their holdings on this question, either before or after Sher. Prior to that case, a number of Louisiana appellate courts had approved awards for mental anguish under § 22:1220, although mostly without addressing the applicability of Civil Code Art. 1998.[44] Following Sher, the decisions remain mixed. The two cases to address mental anguish damages under § 22:1220 post-Sher resulted in divergent outcomes. For example, Louisiana's Fourth Circuit Court of Appeal, in Veade v. Louisiana Citizens Property Corp., held that Civil Code Art. 1998 applies to § 22:1220 damages.[45] The Veade court, in reaching its conclusion, affirmed an award of mental anguish damages on a finding that the insurer acted intentionally[46] and appeared to conflict with prior authority in that circuit permitting mental anguish damages under § 22:1220.[47] The Veade decision briefly refers to the

---

courts in determining permissibility of recovery for mental anguish under § 22:1220).

[44] Orellana v. La. Citizens Prop. Ins. Co., 972 So. 2d 1252 (La. App. 4th Cir. 2007) (affirming damages award for emotional distress under § 22:1220 when insurer failed to pay timely under insured's policy following Hurricane Katrina without mention of Art. 1998); Clark v. McNabb, 878 So. 2d 677 (La. App. 3d Cir. 2004) (affirming award of damages under § 22:1220 for anxiety and mental anguish without mention of Art. 1998); Reed v. Recard, 744 So.2d 13 (La. App. 1st Cir. 1998) (same), abrogated on other grounds; Holt, 680 So. 2d 117 (affirming, but reducing damages for mental anguish awarded under § 22:1220 without mention of Art. 1998).

[45] Veade v. La. Citizens Prop. Corp., 985 So. 2d 1275 (La. App. 4th Cir. 2008).

[46] Id. at 1281.

[47] Orellana, 972 So. 2d at 1256 (Louisiana Fourth Circuit Court of Appeal permitting damages for mental anguish under § 22:1220).

conflicting opinion in Orellana v. Louisiana Citizens Property Insurance Corp., acknowledging that case's holding that "damages can be recovered for mental anguish if the insurer breaches its duty of good faith," and deflecting any apparent conflict by noting Orellana made no mention of the insurer's intent (or lack thereof) to aggrieve the insured.[48] Notably, Veade cites Sher as support, not as determinative of the question. In contrast, Farber v. American National Property & Casualty Co. affirmed an award of general damages for mental anguish under § 22:1220 after Sher.[49]

At least two federal district courts in Louisiana have determined that Civil Code Art. 1998 does not bar § 22:1220 damages for mental anguish under insurance contracts, reasoning that § 22:1220 addresses a harm distinct from breach of contract: breach of the duty of good faith.[50] "The prohibited acts set forth in § 22:1220(B) amount to knowing and vexatious wrongdoing directed toward an insured. The general and special damages award is thus aimed at, and limited to, a caliber of misconduct that goes well beyond an ordinary breach of contract."[51] By this rationale, Art. 1998 simply does not apply. Indeed, the Louisiana Supreme Court itself has acknowledged and endorsed this reading of

---

[48] Veade, 985 So. 2d at 1280-81 (citing Orellana, 972 So. 2d at 1256).

[49] 2008 WL 5159207, at *7 (relying on Orellana with only passing reference to Sher's dissent). Both Veade and Farber look to Orellana for guidance on the availability of mental anguish damages under § 22:1220.

[50] Faust v. State Farm Fire & Cas. Co., No. 06-8470, 2007 WL 1191163, at *4 (E.D. La. 2007) ("Plaintiffs' claims for general damages such as emotional distress do not arise from a simple breach of their insurance contract. Rather, they are based on the asserted violation of State Farm's statutory duty under Section 22:1220 in one or more of the specified ways.") (internal footnote omitted); see also Bowers v. State Farm Fire & Cas. Co., No. 06-830, 2007 WL 2670087, at *1 (E.D. La. 2007) (distinguishing mental anguish damages under § 22:1220 from prohibition on such damages in insurance contracts).
At common law, claims of breach of the duty of good faith are distinct from claims of breach of contract. See, e.g., Med. Care Am., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 341 F.3d 415, 419 (5th Cir. 2003).

[51] Faust, 2007 WL 1191163, at *4.

§ 22:1220 — albeit without express reference to Art. 1998.[52] "[T]he subject matter of the statute is unrelated to that of the contract.... The duties that it does impose upon insurers are separate and distinct from the duties mentioned in the contract of insurance."[53]

This is a more plausible reading of the statute. It is supported by the plain language of § 22:1220, whereas Lexington's proffered reading is not. The statute specifically refers to a breach of the duty of good faith; it does not refer to breach of contract. Furthermore, § 22:1220 is broadly worded, explicitly permitting liability for "any damages sustained,"[54] including, without limitation, "any general or special damages."[55] "General damages are those which may not be fixed with pecuniary exactitude; instead, they 'involve mental or physical pain or suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of life or life-style which cannot be definitely measured in monetary terms.'"[56] By authorizing "any damages," including "any general or special damages," the legislature pointedly permitted the award of mental anguish damages.[57]

---

[52] Manuel v. La. Sheriff's Risk Mgmt. Fund, 664 So. 2d 81, 84 (La. 1995) ("[T]he statute does not speak on a matter that is a subject of the contract, or is specifically addressed in the contract. The statute speaks of an insurer's obligation to act in good faith toward insured and non-insured claimants and establishes penalties for the commission of certain acts, none of which are covered in the contract."). Although Manuel addressed the 1991 version of the statute, the relevant language of the applicable version is identical. The court in Manuel permitted the plaintiffs to sue their insurer for mental anguish damages, among other claims. Id. at 82-83.

[53] Id.

[54] § 22:1220(A).

[55] § 22:1220(C).

[56] Bellard v. American Cent. Ins. Co., 980 So. 2d 654, 674 (La. 2008) (quoting Keeth v. Dep't of Pub. Safety & Transp., 618 So. 2d 1154, 1160 (La. App. 2d Cir. 1993).

[57] Courts have permitted the award of damages for mental anguish caused by insurers' breaches under § 22:1220 for years. The Louisiana Legislature has amended the statute twice

We hold that Art. 1998 is, as a matter of law, inapplicable to § 22:1220 and does not bar the award of mental anguish damages under this statute: Damages for mental anguish may be awarded under § 22:1220 for breaches of the duty of good faith. With this established we must determine whether Dickerson adduced sufficient proof of mental anguish to support an award.

2. Sufficiency of the Evidence

The trial court awarded Dickerson $25,000 in general damages for mental anguish that he suffered from Lexington's arbitrary refusal to pay. Lexington contends that Dickerson did not offer sufficient evidence to support such an award.

Both Dickerson and his daughter, Cindy Bane, testified about his living situation following Hurricane Katrina. Bane testified that the year and a half of fighting with Lexington caused her father's mental health to deteriorate. Bane said that her father became increasingly withdrawn and short-tempered over the course of his ordeal. She noted that he has been living in the bathtub showroom of a store and showering with a garden hose while standing on a wooden pallet in an unheated back room. Dickerson testified that the stress caused a rash for which he eventually had to seek a doctor's care.

Lexington asserts that for an insured to succeed on a claim of mental anguish, the law requires more evidence than Dickerson offered. "[B]are allegations of depression and embarrassment"[58] are insufficient, Lexington contends; mental anguish must rise to the level of medical significance.[59] Lexington insists that Dickerson should have offered the testimony of an expert who could attest to his mental state before and after the storm and to any nexus

---

since 1997 and yet has not clarified the language to bar such awards.

[58] Buddy's Tastee No. 1, Inc. v. Tastee Donuts, Inc., 483 So. 2d 1321, 1324 (La. App. 4th Cir. 1986).

[59] Atwood v. Hylan, 685 So. 2d 450, 454 (La. App. 2d Cir. 1996).

with the ensuing battle with the insurer. Furthermore, argues Lexington, much of the suffering was of Dickerson's own making; he could have saved himself significant hardship by moving into the FEMA trailer that sat unoccupied on his front lawn for months. His unilateral and arbitrary choice to live in a bathtub showroom instead of the trailer should not provide a basis for Lexington's liability.

There is no clear legal standard for what constitutes sufficient evidence of mental anguish in a case such as this. It was up to the trial court as fact-finder to determine whether the evidence Dickerson presented was sufficient to prove that he suffered compensable mental anguish as a result of Lexington's actions. In effect, the question whether there was legally sufficient evidence merges with this factual question. We review the court's factual conclusion for clear error; mixed questions of law and fact de novo.[60]

These cases are necessarily fact-specific, so outcomes vary.[61] The case law provides only anecdotal guidance as to what may or may not suffice to prove compensable mental anguish. "Mental anguish which gives rise to a claim for damages must be a real mental injury that one can reasonably expect a person in such a position to suffer."[62] It "does not require proof that medical or psychiatric care was required as a result of the incident, but minimal worry and inconvenience should not be compensated."[63] Neither is expert testimony mandatory, as Lexington contends.[64]

---

[60] Adams v. Unione Medtierranea, 364 F.3d at 655.

[61] Stanford v. Town of Ball, 903 So. 2d 1235, 1243-44 (La. App. 3d Cir. 2005).

[62] Kim v. Kim, 970 So. 2d 1158, 1165 (La. App. 5th Cir. 2007).

[63] Lacombe v. Carter, 975 So. 2d 687, 690 (La. App. 3d Cir. 2008).

[64] Laurents v. La. Mobile Homes, 689 So. 2d 536, 543 (La. App. 3d Cir. 1997).

For example, in Orellana, the fact that the plaintiff had to stand idle and watch his home deteriorate while his insurer refused to pay helped convince the court that mental anguish damages under § 22:1220 were proper.[65] Another Louisiana court found the evidence sufficient to support an award for mental anguish based on the testimony of an elderly couple who both stated that they felt helpless as they watched their home become more and more damaged by vibrations from a prolonged street drainage construction project in their neighborhood, and that they would have to endure additional distress as the home was repaired.[66] Still another court sanctioned mental anguish damages based on the plaintiffs' testimony that a crop failure forced them to take on mortgages and finance their farming operation on credit cards, causing them "increased stress, irritability, and short tempers."[67] In other cases, Louisiana courts have found testimony of humiliation[68] and fears of possible injury[69] sufficient, but have also held that evidence of damage to reputation and harm from gossiping was insufficient.[70] The case Lexington cites as setting the

---

[65] 972 So. 2d at 1256.

[66] Holzenthal v. Sewerage & Water Bd. of New Orleans, 950 So. 2d 55, 79-80 (La. App. 4th Cir. 2007).

[67] Matt v. Agro Distribution, LLC, 904 So. 2d 928, 934 (La. App. 3d Cir. 2005).

[68] Stanford v. Town of Ball, 903 So. 2d at 1245-46 (plaintiff and his family's testimony about humiliation from living in a home with raw sewage fumes emanating from the plumbing and backing up in the bathtub was sufficient evidence of aggravation and inconvenience endured, but court reduced jury award, finding $175,000 excessive).

[69] Ganhart v. Executive House Apartments, 671 So. 2d 525, 527-28 (La. App. 4th Cir. 1996) (plaintiff testified that leak in apartment above hers caused hers to smell and made her fear a rodent infestation, electrical fire, that her ceiling could fall in or that she could slip on wet carpet).

[70] Kim, 970 So. 2d 1158 at 1165 (plaintiff testified she suffered mental anguish from damage to her reputation and gossiping about her due to defendant's failure to comply with their business partnership agreement).

standard at "psychic trauma requiring medical treatment" is inapposite here.[71] That case concerned a property owner's claim of psychic trauma as a result of physical damage to his property resulting from a property dispute; it is a specific type of mental anguish claim and thus distinct from the instant situation.

Dickerson did not offer expert or medical testimony, but he did offer more than "bald assertions." His daughter's testimony of watching her father's mental state deteriorate and his becoming short-tempered and anti-social is more than bare or conclusional. The same holds for Dickerson's testimony that he suffered a rash from the stress, for which he did seek medical care. Although Lexington contends plausibly that Dickerson could have mitigated his suffering, the district court was best positioned to make credibility determinations of the witnesses, and it found the weight of the evidence tipped in favor of Dickerson. On review, we find no clear error in the district court's conclusions grounded largely in credibility determinations.

## F. Applicability of § 22:658 Amendment Permitting Attorneys' Fees

Section 22:658(B)(1) permits the imposition of penalties against insurers who delay payment of claims in bad faith. A post-Katrina amendment to this statute that took effect on August 15, 2006 altered the statute in two significant ways: (1) Penalties were doubled from 25 percent to 50 percent of any amounts, in addition to the payment for the claim, determined to be due from the insurer,[72] and (2) recovery of attorneys' fees by the insured was permitted. Hurricane Katrina plaintiffs have advanced several arguments to encourage courts to permit the amended version of the statute to apply to their insurance disputes. Here, Lexington insists that the amendments do not apply because they did not take effect until after Dickerson filed his claim. The critical

---

[71] Atwood, 685 So. 2d at 454.

[72] The district court awarded penalties under § 22:1220, not under § 22:658, so this portion of the amendment is not at issue here.

question is at what point on the timeline does an insurer's refusal to pay trigger the penalty provisions of § 22:658.[73] Courts have disagreed about this, pinpointing, for example (1) the filing of the initial claim, (2) the submission of satisfactory proof of loss, (3) the insurer's refusal to pay or denial of a claim, and (4) an ongoing refusal to pay. In Sher, the Louisiana Supreme Court clarified that, as a general rule, the relevant event for triggering the attorneys' fees provisions of § 22:658 is the submission of satisfactory proof of loss.[74] In so doing, the Sher court rejected two arguments that might have permitted other Katrina victims to benefit from the amended § 22:658: (1) that injury from an insurer's bad faith delay of payment or denial of recovery continues so long as the delay or denial continues,[75] and (2) that the amendments were retroactive.[76] At the same time, the Sher court left some room for holding that other later-occurring events might trigger § 22:658, noting that if Sher had not yet submitted his satisfactory proof of loss, a petition for damages could have sufficed, and that if damage is discovered after the first claim is made and the insurer fails timely to pay this additional claim, such a failure might give rise to penalties.[77]

Lexington argues that Sher forecloses the award of attorneys' fees in this case because the satisfactory proof of loss was submitted and payment was refused before August 15, 2006. We agree. The district court awarded Dickerson

---

[73] The answer to this question has significant implications for victims of Hurricane Katrina that extend beyond any single case, because most Katrina victims made claims well before the amendments took effect. If, however, the measuring event is not limited to the filing of a claim — for example, it might be the refusal by the insurer to pay — some of those claimants still might benefit from the amendment.

[74] 988 So. 2d at 199. In Sher, the owner of a small apartment building in which he lived sought recovery following Hurricane Katrina under his commercial all-risk insurance policy.

[75] Id.

[76] Id. at 201.

[77] Id.

attorneys' fees and costs under § 22:658 in the amount of $53,105 in reliance on the "continuing breach" rationale, holding that Lexington could be liable for that part of the breach (the continued refusal to pay) that extended past August 15, 2006.

After Sher, Louisiana law clearly prohibits the continuing-breach rationale employed by the district court in this case, irrespective of any merit that it might have had at the time of decision. Dickerson filed his claim with Lexington in the fall of 2005, prior to the August 15, 2006 effective date of the amendment to § 22:658. Even though Sher post-dates the district court's judgment on attorneys' fees in this case,[78] the intervening Louisiana Supreme Court decision controls. We must apply the "latest and most authoritative expression of state law applicable to the facts of a case."[79] We therefore reverse the judgment of the district court to the extent that it awarded attorneys' fees. Because it is possible, however, that some damage was not discovered until after August 15, 2006 (Lexington made its third inspection in 2007 during which it found new damage), we remand this issue to the district court for it to consider whether attorneys' fees under the amended version § 22:658 might apply to any part of the insurance proceeds that were paid after the effective date of the amendment.

## III. CONCLUSION

We reverse that part of the judgment which awards attorneys' fees and remand it to the district court for further proceedings consistent with this opinion. We affirm the judgment of the district court in all other respects.

---

[78] The trial court entered judgment as to attorneys' fees on September 11, 2007. Sher was decided on April 8, 2008.

[79] Santibanez v. Wier McMahon & Co., 105 F.3d 234, 239 (5th Cir. 1997); see also Vandenbark v. Owens-Illinois Glass Co., 311 U.S. 538, 542-43 (1941) ("[T]he dominant principle is that nisi prius and appellate tribunals alike should conform their orders to the state law as of the time of the entry. Intervening and conflicting decisions will thus cause the reversal of judgments which were correct when entered.")

REVERSED and REMANDED in part; AFFIRMED in part.