# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-30596
Summary Calendar

United States Court of Appeals
Fifth Circuit

**FILED**

March 15, 2018

Lyle W. Cayce
Clerk

CHINOOK USA, L.L.C.,

Plaintiff - Appellant

v.

DUCK COMMANDER, INCORPORATED; DAHLEN ASSOCIATES, INCORPORATED; 3292 BRANDS, L.L.C.; CHECKERED FLAG BUSINESS, L.L.C.; GO-TIME ENERGY, L.L.C.,

Defendants - Appellees

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 3:16-CV-113

Before KING, ELROD, and HIGGINSON, Circuit Judges.

PER CURIAM:*

Plaintiff–Appellant Chinook USA, LLC, initiated this action against Defendants–Appellees Duck Commander, Inc., Dahlen Associates, Inc., 3292 Brands, LLC, Go-Time Energy, LLC, and Checkered Flag Business, LLC, for, inter alia, breach of a licensing agreement. After a bench trial, the district court ruled in favor of the defendants. Chinook appealed. We AFFIRM.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 17-30596

## I.

Duck Commander, Inc. ("DC"), is a Louisiana corporation owned by the Robertson family, which originally manufactured and marketed duck calls and hunting-related equipment. The Robertson family had starred in a reality television series called Duck Dynasty on the A&E network. Si Robertson ("Uncle Si") is one of the Robertson family members and had a well-known affinity for iced tea. DC retained Dahlen Associates, Inc. ("Dahlen Associates"), as its licensing agent for DC-branded products. Afterwards, Rachel Dahlen and Korie Robertson formed 3292 Brands, LLC ("3292 Brands"), to oversee and maintain a licensing process for such products.

Chinook USA, LLC ("Chinook"), is a company that bottles, markets, and sells ready-to-drink ("RTD") beverages. At all relevant times, Mark Gunderson was Chinook's Chief Marketing Officer, and David Salmon was Chinook's President and Chief Operating Officer. Paul Cox owned and operated a venture capital firm that provided funding to Chinook to approach DC about producing and licensing an Uncle Si's Iced Tea. Chinook submitted a licensing proposal to DC, which DC accepted. DC then presented its form licensing agreement to Chinook. In addition to Trey Fisher, Gunderson and Salmon negotiated the final agreement on behalf of Chinook. Rachel Dahlen, Scott Headington, Korie Robertson, and David Bolls negotiated on behalf of DC.

On January 7, 2014, Chinook and DC executed the Licensing Agreement ("Agreement") that had an effective date of October 23, 2013. Under this Agreement, Chinook had a five-year exclusive right to license, manufacture, and distribute DC-branded "Licensed Products." "Licensed Products" are defined as "Iced tea, Ready-to-Drink (RTD) Teas, RTD Beverages." In exchange, Chinook agreed to pay DC an annual $1,000,000 guaranteed minimum royalty and a royalty based on net sales, set forth in Schedule A, paragraph 6, of the Agreement. Chinook also agreed to pay $1,000,000 for Si

No. 17-30596

Robertson's endorsement of the DC-branded iced tea. The endorsement fee provisions are in Schedule B, and, as relevant here, they state:

Endorsement: Licensee agrees to support the launch of the Duck Commander Ice Tea program with a personal endorsement fee for Si Robertson of $1,000,000 and for the support of key Robertson family members. Si Robertson and key Robertson family members involvement includes activities such as;

**Content Development | Social Media**: Year One for "content development" is critical to help launch, promote and grow the Iced Tea brand.

Examples of activities include but are not limited to:

- YouTube Video Development
- 6-Second Vine Videos | Snapchat Video
- Instagram | Pinterest Photo Development
- Facebook Content Development
- Twitter Content (and Tweets or Re-Tweets from Uncle Si)
- Signing of select brand items (off-site — not event based)
- Quick customized welcome videos for Distributor Sales Pitches (primarily Quarter One/Year One)
- Content for blogs (pre-determined)

*\*As the face of the brand, our goal is to drive direct association with Uncle Si and the tea, it's very important Year 1 & 2 that we tell the brand story through meaningful quick video and pictures. We will bundle content requests to maximize Uncle Si's time. Our goal is to build the Duck Commander Iced Tea brand into a brand that sustains revenue for many decades to come.*

Included in the agreement is the support of Duck Commander and key Robertson family members and the support of their social media and public relations efforts when appropriate. . . .

**Media Interviews**: Up to ten 15 - minute interviews during first six months of launch. We will work closely with Duck Commander team to drive smart and strategic media exposure. . . .

**Special Appearances**: One per quarter, up to four annually. These will be decided upon by Si and Korie and Willie Robertson

3

based on their assessment of which events will be the most impactful and workable for Si. . . . [Chinook] to submit appearance suggestions to Dahlen for review with the family.

**Planning Meetings**: Two annual planning meetings with Robertson family members. Additional meetings will be handled by Dahlen team.

The Agreement is governed by Louisiana law and contains an integration clause which states that the Agreement is the "entire understanding of the parties" and "shall not be modified or amended except in writing signed by the parties hereto and specifically referring to this Agreement."

On April 1, 2014, DC entered into an agreement with Go-Time Energy, LLC ("Go-Time"), which granted Go-Time a three-year exclusive right to license, manufacture, sell, and distribute DC-branded energy shots. On August 6, 2014, 3292 Brands provided Chinook with a proposal to DC from Checkered Flag Business, LLC ("Checkered Flag"), to license a vitamin water and gave Chinook an opportunity to submit a proposal for a similar product, which Chinook later turned down. 3292 Brands also attached a proposed amendment to the Agreement that would give Chinook the right of first refusal for future opportunities. Chinook did not sign that amendment. Later, on September 22, 2014, DC granted Checkered Flag a five-year non-exclusive license to sell DC-branded vitamin water. In January 2015, DC and Checkered Flag terminated their licensing agreement.

In January 2014, Chinook paid DC a $250,000 royalty payment. Around late June 2014, Chinook transferred $250,000 to 3292 Brands, which acted as an agent for DC. Sales for the iced tea product then fell flat in summer 2014. Around late September 2014, Chinook transferred another $250,000 to 3292 Brands, which again acted as an agent for DC.

No. 17-30596

In January 2016, Chinook initiated this action against DC, Dahlen Associates, 3292 Brands, Go-Time, and Checkered Flag. Chinook alleged fraud in the inducement, breach of contract, breach of the covenant of good faith, federal trademark infringements, tortious interference with a contractual relationship, civil conspiracy relating to tortious interference with a contractual relationship, unfair trade practices, and bankruptcy-related claims. In March 2016, DC asserted a counter-claim that Chinook breached the contract by failing to pay DC the royalty payments and endorsement fee. The following month, the district court dismissed the federal-trademark-infringements claim and bankruptcy-related claims with prejudice. On February 2, 2017, both sides moved for summary judgment. In May 2017, the district court ruled on these motions. It denied Chinook's motion for partial summary judgment in its entirety and denied the defendants' motion for summary judgment in part and granted it in part, dismissing Chinook's claims related to tortious interference with a contractual relationship and civil conspiracy. Subsequently, the district court held a bench trial on June 5 and 6, 2017. The district court entered judgment in favor of the defendants with respect to Chinook's remaining claims of fraud in the inducement, breach of contract, breach of the covenant of good faith, and unfair trade practices. It also entered judgment in favor of Chinook with respect to DC's breach-of-contract counterclaim. Chinook timely appealed, and now argues that the district court erred in concluding that DC did not breach the Agreement.[1]

## II.

As this is a diversity case, we apply Louisiana law. *See Dickerson v. Lexington Ins. Co.*, 556 F.3d 290, 294 (5th Cir. 2009). The district court's

---

[1] The district court found that Chinook abandoned the breach-of-contract claims against all of the defendants except for DC. Chinook does not challenge this finding on appeal and only argues for breach of contract by DC.

findings of fact are reviewed for clear error, and conclusions of law are reviewed de novo. *See Kona Tech. Corp. v. S. Pac. Transp. Co.*, 225 F.3d 595, 601 (5th Cir. 2000).

Chinook contends that DC violated the Agreement in two ways. First, Chinook argues that the Agreement granted it an exclusive license for all as-is ready-for-consumption beverages, and DC violated the Agreement when DC contracted with Go-Time for energy shots and Checkered Flag for vitamin water. Second, Chinook claims that DC breached the Agreement by failing to comply with the endorsement provisions. Under Louisiana law, the elements of a breach of contract claim are "(1) the obligor's undertaking an obligation to perform, (2) the obligor failed to perform the obligation (the breach), and (3) the failure to perform resulted in damages to the obligee." *Favrot v. Favrot*, 68 So. 3d 1099, 1108–09 (La. Ct. App. 2011). "The burden of proof in an action for breach of contract is on the party claiming rights under the contract." *Vignette Publ'ns, Inc. v. Harborview Enters., Inc.*, 799 So. 2d 531, 534 (La. Ct. App. 2001) (citing *Phillips v. Insilco Sports Network, Inc.*, 429 So. 2d 447, 449 (La. Ct. App. 1983)).

"Contract interpretation is a question of law which we review de novo." *Kona*, 225 F.3d at 609 (citing *Fina, Inc. v. ARCO*, 200 F.3d 266, 268 (5th Cir. 2000)). Under Louisiana law, the general rules of contract interpretation are contained in articles 2045–2057 of the Louisiana Civil Code. "Interpretation of a contract is the determination of the common intent of the parties." La. Civ. Code Ann. art. 2045. A contract provision "must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." *Id.* art. 2050. "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." *Id.* art. 2046.

Extrinsic evidence is admissible only when "the written expression of the common intention of the parties is ambiguous." *Campbell v. Melton*, 817 So. 2d 69, 75 (La. 2002) (citing *Ortego v. State, Dep't of Transp. & Dev.*, 689 So. 2d 1358, 1363 (La. 1997)). "A contract is considered ambiguous on the issue of intent when either it lacks a provision bearing on that issue, the terms of a written contract are susceptible to more than one interpretation, there is uncertainty or ambiguity as to its provisions, or the intent of the parties cannot be ascertained from the language employed." *Id.* (collecting authorities). If an ambiguity remains after applying the other general rules of construction, then the ambiguous contractual provision is to be construed against the drafter. *See* La. Civ. Code Ann. art. 2056; *Hebert v. Webre*, 982 So. 2d 770, 774 (La. 2008).

Chinook argues that "RTD Beverages" in the Agreement is not ambiguous and incorporates energy shots and vitamin water. It also contends, alternatively, that if (as the district court held) the term is ambiguous, the district court erred by failing to address the appropriate objective factors under Louisiana law. We find its arguments unpersuasive. The Agreement granted Chinook a five-year exclusive right to license, manufacture, sell, and distribute DC-branded "Iced tea, Ready-to-Drink (RTD) Teas, RTD Beverages." "RTD Beverages" is not expressly defined in the contract. The term is susceptible to more than one interpretation. *Cf., e.g.*, *Nelson v. Nelson*, 985 So. 2d 1285, 1290 (La. Ct. App. 2008) ("Either interpretation can be reasonably ascertained from the four corners of the [contract]."). On one hand, the term could cover all beverages that are as-is ready for consumption including energy shots and vitamin water. On the other hand, as tea (i.e., the main product under the Agreement) is part of a category of beverages that generally require an additional step of preparation prior to consumption, the term may cover only the beverages within this category. Thus, we agree with the district court that the term "RTD Beverages" in the Agreement is ambiguous.

No. 17-30596

When the parties' intent cannot be solely discerned from the text of the contract, a court can rely on uncontradicted testimony of one of the parties to determine intent. *See, e.g.*, *Book v. Schoonmaker*, 26 So. 2d 366, 369 (La. 1946). Those who negotiated on behalf of DC testified that "RTD Beverages" did not incorporate all as-is ready-for-consumption liquids. Specifically, Dahlen testified that contract exclusivity was for "unsweetened tea and sweet tea." She also testified that "RTD is a definition that we utilize when we're describing something where you would normally have to have another step," that the definition is utilized "in iced tea and coffee almost exclusively," and that during the negotiations, tea was the focus for 95 percent of the time and Chinook's progression into coffee was the focus for the remaining 5 percent. Dahlen, Bolls, and Korie Robertson all testified that "RTD Beverages" could encapsulate potential future coffee products.

Chinook did not present any testimony from Fisher, Gunderson, and Salmon—the parties who negotiated on its behalf. It presented testimony from Cox and Willie Robertson that the contract concerned more than just teas and coffees, but they did not participate in the negotiations. Chinook argued that DC had proposed the addition of a first right of refusal to the Agreement because DC wanted to remove exclusivity for energy shots and vitamin water. But Dahlen and Bolls testified that DC drafted the amendment at Chinook's request "to be good partners." Further, on May 16, 2014, Salmon had sent a letter to Bolls, requesting a confirmation that Chinook had an exclusive license over the "Licensed Products." Bolls replied stating, "[t]hank you for taking the time to ask for a confirmation of Chinook USA's rights as our exclusive licensee of tea in single serve and food service channels. This email confirms the same." Chinook did not dispute the coverage of the exclusive license until months later, when sales became stagnant.

8

No. 17-30596

Based on the extrinsic evidence, we agree with the district court's conclusion that the parties intended that "RTD Beverages" be limited to teas and coffees.[2] Accordingly, Chinook did not meet its burden to prove that DC had agreed to exclusively license energy shots and vitamin water to Chinook and therefore did not show that a violation of the contract's exclusive license occurred.

Next, Chinook argues that the district court erred by placing the burden on Chinook to make repeated requests to DC to comply with the endorsement provisions and that DC breached the Agreement by failing to comply with these provisions. We find these contentions unpersuasive as well. In the district court, Chinook contested DC's fulfillment of the endorsement provisions in the following sections of Schedule B: "Content Development | Social Media," "Media Interviews," "Special Appearances," and "Planning Meetings." On appeal, Chinook's primary argument is that the plain language of the contract does not impose a requirement for Chinook to make requests for media and advertising assistance from DC. Even assuming arguendo this is true,[3] the plain language also does not mandate the specified activities in the aforementioned sections of Schedule B. Under the terms of Schedule B, DC merely "agree[d] to support the launch of the [DC] Ice Tea program" and that such support "include[d] activities *such as*" those enumerated in the

---

[2] Conflicting testimony was presented on who the drafter of the term "RTD Beverages" was. However, it is not necessary to determine who the drafter was because the term is only construed against the drafter "[i]n case of doubt that cannot be otherwise resolved." La. Civ. Code Ann. art. 2056.

[3] We need not resolve whether the plain language supports a requirement for Chinook to make requests for DC's support, but we note that there is some evidence in the language of Schedule B that suggests that such a requirement existed. In "Content Development | Social Media," it states that "[w]e will bundle content requests to maximize Uncle Si's time." In "Special Appearances," it states that Chinook will "submit appearance suggestions to Dahlen for review with the family."

aforementioned sections (emphasis added). These sections did not include language that mandated the listed activities.

Further, Korie Robertson testified that the parties negotiated that Chinook would perform social media and traditional advertising of the product, that DC thought Chinook would "take the lead" and submit requests to Dahlen for assistance, and that requests would be made to "maximize Uncle Si's time." The district court considered the evidence presented and concluded that it was reasonable for DC to decline certain requests or reschedule others due to, for example, short notice in the process of working together with Chinook. Chinook does not contest any specific piece of evidence on appeal. Accordingly, Chinook did not meet its burden to prove that DC breached the endorsement provisions in Schedule B.

## III.

For the foregoing reasons, we AFFIRM the district court's judgment against Chinook on Chinook's breach of contract claim.